FIREMAN'S FUND INSURANCE COMPANY, a California corporation, Plaintiff–Appellant,

v.

CITY OF LODI, CALIFORNIA, Jack Sieglock; in his capacity as Mayor of the City of Lodi; Richard Prima, Jr., in his capacity as Enforcing Officer of Lodi Ordinance No. 1650; Randall A. Hays, individually and in his capacity as Lodi City Attorney; Michael C. Donovan, individually and in his capacity as Lodi Assistant City Attorney; Adam L. Babich, individually and in his capacity as Lodi Assistant City Attorney; Steven H. Doto, individually and in his capacity as Lodi Assistant City Attorney; Bret A. Stone, individually and in his capacity as Lodi Assistant City Attorney; John R. Till, individually and in his capacity as Lodi Assistant City Attorney; Zevnik, Horton, Guibord and Mc-Govern, LLP, individually and in their capacity as Lodi Assistant City Attor-

neys; Fran E. Forkas, in his capacity as Enforcing Officer of Lodi Ordinance No. 1650; Defendants–Appellees.

Unigard Insurance Company, a Washington corporation; Unigard Security Insurance Company, a Washington corporation, Plaintiffs–Appellants,

v.

City of Lodi, Defendant–Appellee.

Nos. 99–15614, 99–15802.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted April 7, 2000

Filed Oct. 30, 2001

Amended Jan. 8, 2002.

Terry J. Houlihan, McCutchen, Doyle, Brown & Enersen, San Francisco, California, for plaintiff-appellant Fireman's Fund Insurance Co.

Dennis Zarazoga, Law Offices of Dennis Zarazoga, San Francisco, California, for plaintiffs-appellants Unigard Insurance Company and Unigard Security Insurance Company.

Randall A. Hays, City Attorney, Lodi, California, Michael C. Donovan and Cecelia C. Fusich, Assistant City Attorneys, Envision Law Group, LLP, Lafayette, California, for the defendants-appellees.

Before: PREGERSON, D.W. NELSON, Circuit Judges and MOSKOWITZ, District Judge.[1]

PREGERSON, Circuit Judge:

This consolidated appeal of two separate actions requires us to consider the constitutionality of an innovative municipal ordinance enacted by the City of Lodi, California ("Lodi" or "the City") to remedy hazardous waste contamination within its borders. Fireman's Fund Insurance Company ("Fireman's Fund"), Unigard Insurance Company, and Unigard Security Insurance Company ("Unigard") (col-

1. The Honorable Barry Ted Moskowitz, United States District Judge for the Southern District of California, sitting by designation.

lectively "the Insurers") appeal from the district court's judgments in favor of Lodi in the Insurers' separate but related actions for declaratory and injunctive relief. Both Fireman's Fund and Unigard filed suit to prevent Lodi from enforcing a local ordinance, the Comprehensive Municipal Environmental Response and Liability Ordinance ("MERLO" or "the Ordinance"), an ordinance which permits the City to investigate and remediate the hazardous waste contamination of its soil and groundwater.

The Insurers allege that MERLO is preempted by the federal Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), 42 U.S.C. §§ 9601–9675, and by various state laws including California's Carpenter–Presley–Tanner Hazardous Substance Account Act, ("HSAA"), Cal. Health & Safety ("H & S") Code §§ 25300–25395.15.[2] We have jurisdiction pursuant to 28 U.S.C. § 1291, and we affirm in part, reverse in part, and remand for further proceedings consistent with this opinion.

## I.

## BACKGROUND

### A. The Contamination of Lodi's Water

Lodi first detected the presence of tetrachloroethylene ("PCE"), in its groundwater in April 1989. PCE is a known carcinogen that is often used as a dry-cleaning agent.[3] Groundwater is Lodi's sole source of drinking water and the primary source of water for agricultural use in California's Central Valley.

Three years later, in 1992, the Central Valley Regional Water Quality Control Board ("RWQCB") issued a report entitled "Dry Cleaners—A Major Source of PCE in Ground Water." The report concluded that the source of the contamination was "the discharge of PCE-containing wastewater i[n]to the sewer lines" by local dry cleaning businesses.[4] The following year, the Department of Toxic Substances Control ("DTSC") of the California Environmental Protection Agency began investigating the PCE contamination. DTSC is the state agency responsible for ensuring that California's public health and environment are protected from the harmful effects of hazardous substances. See Cal. H & S Code §§ 25312, 25313, 25350–25359.8. DTSC is authorized to oversee the cleanup of hazardous waste sites by issuing remedial orders and by entering into agreements with "potentially responsible parties" ("PRPs" or "RPs") to facilitate remediation.

DTSC's investigation revealed that four small businesses were potentially responsible for the PCE-contaminated wastewater that migrated throughout Lodi by land disposal, sewer lines, and city water wells. One business, Lustre–Cal Nameplate Corporation ("Lustre–Cal")—a manufacturer

---

**2.** Pursuant to a sunset clause, the original Carpenter–Presley–Tanner Hazardous Substance Account Act, also known as the California Superfund, became inoperative on January 1, 1999. HSAA, Cal. H & S Code § 25395. The reenacted HSAA went into effect on May 26, 1999, without a sunset clause. Actions and agreements pursuant to the previous version of HSAA are governed by the reenacted law. See 1999 Ch. 23 § 3.

**3.** See Central Valley Regional Water Quality Control Board, "Dry Cleaners—A Major Source of PCE in Ground Water," pp. 20–21, March 27, 1992.

**4.** According to the RWQCB report, the following Central Valley cities have PCE-contaminated municipal wells: Chico, Oroville, Roseville, Sacramento, Elk Grove, Lodi, Stockton, Modesto, Patterson, Turlock, Merced, Los Banos, Fresno, Visalia, Porterville, and Bakersfield.

of color anodized and etched aluminum nameplates and labels—is insured by defendant Fireman's Fund. Another business, Busy Bee Laundry & Cleaners ("Busy Bee")—a dry cleaner—was a tenant of M & P Investments, which is insured by defendant Unigard. As a result of its investigation, DTSC listed the "Lodi Groundwater Site" as a state hazardous waste site beginning in fiscal year 1993–94.[5] This is significant because listed sites are subject to the "procedures, standards, and other requirements" of HSAA. Cal. H & S Code § 25356(d). After it listed the Lodi Groundwater Site, DTSC began an HSAA-authorized administrative action against selected PRPs, including Lodi, to address the soil and groundwater contamination.[6]

## B. Lodi's Investigation and Remediation Strategy

In January 1997, Lodi retained the law firm of Zevnik, Horton, Guibord & McGovern, LLP to assist the City in developing a strategy for the investigation and remediation of the PCE contamination. Lodi next initiated a series of events that culminated in the adoption of MERLO.

First, in April 1997, Lodi adopted Ordinance No. 1647, which declared the presence of any unpermitted hazardous substance in the environment a per se nuisance.[7] Second, in May 1997, Lodi and DTSC entered into a "Comprehensive Joint Cooperation Agreement" ("Cooperative Agreement" or "Agreement"). Under the Agreement, DTSC and Lodi agreed to "coordinate and cooperate in a single and consolidated effort" to timely investigate and remediate the hazardous substance contamination affecting the City. Consistent with this joint effort, DTSC designated Lodi the "lead enforcement entity" in the cleanup of hazardous substances in and around the City. In exchange, Lodi agreed to "actively seek the input ... of DTSC in the settlement of any environmental enforcement actions" brought by the City pursuant to the Cooperative Agreement, and DTSC agreed "not to independently prosecute any claims [against PRPs] without the full cooperation of ... Lodi." Lodi also agreed either to clean up the contamination itself or to compel PRPs to do so.

The Agreement further states that DTSC retains its authority under HSAA to oversee Lodi's investigation and remediation efforts, and to review and approve any remediation plan developed by the City. The Agreement also states that Lodi acknowledges that DTSC "may have certain claims against the City of Lodi relating to the released Hazardous Substances, which arise from or relate to the City of Lodi's design, construction, operation or maintenance of the commercial, industrial and residential storm and sanitary sewer systems operated by the City." In light of this acknowledgment, Lodi agreed to reimburse DTSC for past and future response costs not to exceed $1,024,549.55, if those costs were not reimbursed by PRPs as a result of Lodi's investigation and remedia-

---

5. *See* Cal. H & S Code §§ 25355–6 (describing California's listing procedures).

6. Despite this action by the State of California, the federal Environmental Protection Agency ("EPA") has never employed federal resources to initiate a comparable administrative proceeding at the federal level. The EPA has also never listed the Lodi Groundwater Site on the National Priorities List ("NPL"), a list of those sites that the EPA has determined are most in need of remediation. *See* 42 U.S.C. § 9605(a)(8)(B) (2001). As discussed *infra* at Section III.A., only NPL listed sites are eligible to receive federal Superfund dollars.

7. Cal. Gov't Code § 38771 states that: "By ordinance the city legislative body may declare what constitutes a nuisance."

tion efforts. Nevertheless, Lodi continues to deny being a PRP. Indeed, the Cooperative Agreement between DTSC and Lodi specifically includes a section entitled "No Admission of Liability," in which Lodi expressly disclaims any admission of liability "arising from or relating to the City of Lodi's design, construction, maintenance, or operation of sanitary and storm sewer systems . . . ."

In consideration for Lodi's agreement to reimburse DTSC, DTSC granted Lodi a "covenant not to sue with respect to claims arising from . . . Lodi's design, construction, operation or maintenance of any storm or sanitary sewer systems." DTSC also agreed to protect Lodi from contribution actions under CERCLA, 42 U.S.C. § 9613(f)(2), and California's contribution statute, Cal.Code Civ. Pro. § 877, for "matters addressed" in the Cooperative Agreement.

The third event that preceded Lodi's adoption of MERLO occurred a month after the City entered into the Cooperative Agreement with DTSC. In June 1997, in accordance with the federal Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6972(b)(2)(A), Lodi issued "Notices of Endangerment" to various PRPs, including Lustre–Cal, which is insured by Fireman's Fund. Notices of Endangerment may be issued by any citizen and are a condition precedent to filing suit under RCRA's citizen suit provision. *See* 42 U.S.C. § 6972(b)(2)(A). The notice to Lustre–Cal stated that "the City of Lodi requires that potentially responsible parties, including Lustre–Cal, perform a prompt, comprehensive and cost-effective environmental investigation and remediation of the Site." The notice also stated that Lustre–Cal and the other PRPs were jointly and severally liable for investigation and remediation costs, and that Lodi intended to commence a civil or administrative ac-

tion against Lustre–Cal unless it settled with the City. *Fireman's Fund Ins. Co. v. City of Lodi*, 41 F.Supp.2d 1100, 1105 (E.D.Cal.1999).

Finally, on August 6, 1997, Lodi's City Council enacted the "comprehensive municipal environment response and liability ordinance" as required by the Cooperative Agreement. Ordinance 1650—commonly known as MERLO—sets forth a comprehensive remedial liability scheme modeled on CERCLA and HSAA. MERLO specifically provides Lodi with municipal authority to investigate and remediate existing or threatened environmental nuisances affecting the City, and to hold PRPs or their insurers liable for the cost of the City's nuisance abatement activities. *See generally* MERLO §§ 8.24.010–8.24.090.

In order to facilitate this effort, MERLO: (1) authorizes Lodi to demand the production of documents related to environmental contamination or to any PRP's ability to pay for investigation and abatement, *id.* § 8.24.050; (2) creates an administrative hearing process subject to judicial review to resolve liability issues, *id.* at § 8.24.060; (3) authorizes Lodi to initiate municipal enforcement actions against PRPs, *id.* at § 8.24.080; (4) authorizes Lodi to bring direct actions against insurers of insolvent PRPs that would resolve the PRP's liability and the insurers' coverage obligations in one proceeding, *id.* at § 8.24.090(B); and (5) creates a "Comprehensive Environmental Response Fund" to be used for the investigation and abatement of environmental nuisances in and around Lodi, *id.* at § 8.24.070.

■ On November 17, 1999, Lodi's City Council repealed Ordinance 1650 and reenacted an amended version of MERLO as Ordinance No. 1684. The amended version of MERLO became effective on December 17, 1999. Because we apply the law in effect at the time of decision, we

must decide the issues raised in these related appeals based on the current version of MERLO. *See Bradley v. Richmond Sch. Bd.*, 416 U.S. 696, 711, 94 S.Ct. 2006, 40 L.Ed.2d 476 (1974).[8]

## C. Procedural History of the Present Actions

As set forth above, this consolidated appeal involves two separate but related challenges to MERLO—one brought by Unigard, and a second brought by Fireman's Fund. Because the two lawsuits raise many of the same issues, including the question whether MERLO is preempted by CERCLA or HSAA, we have consolidated the cases for purposes of this appeal. Nevertheless, the cases have distinct procedural histories and come to us on appeal from separate rulings by the district court.

### 1. The Origins of the Unigard and Fireman's Fund Actions

Shortly after enacting MERLO, and pursuant to its authority under MERLO section 8.24.050, Lodi served Unigard with certain Information Gathering Demands ("Demands"). The Demands stated that

Unigard is the insurer of M & P Investments, which may have incurred liability for the PCE contamination as a result of dry cleaning business operations on Lodi property. The Demands ordered Unigard to produce documents related to endorsements in the policy that Unigard issued to M & P Investments.

Unigard responded to the Demands with various objections, and the City responded to Unigard's objections by filing a criminal complaint against Unigard in state court. Unigard responded, in turn, by filing a writ petition in Superior Court, requesting a stay of the criminal proceeding. The Superior Court granted Unigard's petition and issued a stay to provide Unigard the opportunity to challenge the legality of MERLO in a non-criminal proceeding. Because the writ proceeding provided Lodi with an adequate forum to litigate its claims against Unigard, the state court dismissed Lodi's criminal complaint against Unigard in May 1998.

Also in May 1998, Lodi filed an abatement action pursuant to its authority under MERLO against Unigard's insured, M & P Investments. Three weeks later, on May 21, 1998, Unigard filed the present

8. Although the reenacted version of MERLO became effective while the Insurers' appeals were pending before this court, neither party has moved to dismiss the present appeals as moot. Moreover, our analysis of the two versions of MERLO reveals that Ordinance No. 1684 is substantially similar to the original version of MERLO. Indeed, with two exceptions, the Insurers argue that Lodi has merely repealed one preempted ordinance and replaced it with a second ordinance that is similarly preempted. *Cf. Public Serv. Co. of Colorado v. ShoshoneBannock Tribes*, 30 F.3d 1203, 1205–06 (9th Cir.1994). Thus, the core disputes between the parties remain.

Furthermore, the reenacted MERLO specifically provides that any action taken under the original MERLO "shall remain in effect" under the reenacted version of the Ordinance. The reenacted MERLO also provides that any changes made to the Ordinance as a result of the amendments apply retroactively to all proceedings initiated under the original MERLO. Finally, the general "savings clause" in Lodi Municipal Code § 1.01.080, which was enacted in 1985 well before Lodi adopted either version of MERLO, further establishes the continuing viability of any remedial enforcement actions initiated by Lodi before it repealed and reenacted MERLO.

Accordingly, we hold that the controversy between the Insurers and Lodi is still "live" and that the repeal and reenactment of MERLO did not moot the Insurers' claims at issue in this appeal. We express no opinion, however, on whether the reenacted version of MERLO may moot or otherwise impact some of the issues to be considered by the district court for the first time on remand.

action in United States District Court for the Northern District of California. In its complaint, Unigard alleges that Lodi adopted MERLO in order to shift its own liability for the PCE contamination to the insurers of other PRPs. Unigard's complaint further alleges that MERLO: (1) violates the Supremacy Clause of the United States Constitution because it is preempted by CERCLA; (2) violates Article 11 of the California State Constitution because it is preempted by HSAA and California Insurance Code § 11580; and (3) violates the Contracts Clause of the United States Constitution.

After abstaining from deciding certain claims unrelated to this appeal, the district court issued an order to show cause why Unigard's action should not be transferred to the Eastern District of California. The district court ultimately found that Unigard's remaining claims "have an insufficient connection to the Northern District of California" and transferred the action to the Eastern District of California. All of Unigard's claims were dismissed prior to the transfer, with the exception of the federal and state preemption claims, and the federal contracts clause claim.

Meanwhile, on August 6, 1998, Fireman's Fund filed a similar declaratory and injunctive relief action against Lodi in the United States District Court for the Eastern District of California. In addition to naming Lodi as a defendant, Fireman's Fund also named: (1) Lodi's Mayor, Jack Sieglock, in his official capacity; (2) MERLO Enforcement Officers Richard C. Prima, Jr. and Fran E. Forkas in their official capacities; (3) Lodi City Attorney Randall A. Hays in his official and individual capac-

ities; and (4) Michael C. Donovan and Zevnik Horton Guibord & McGovern, LLP (collectively, the "Law Firm"), private attorneys acting as assistant city attorneys for Lodi, in their official and individual capacities.[9] Like Unigard's complaint, the Fireman's Fund complaint alleges, *inter alia*, that MERLO: (1) violates the Supremacy Clause of the United States Constitution; (2) violates Article 11 of the California State Constitution because it is preempted by HSAA and California Insurance Code § 11580; and (3) impairs Fireman's Fund's right to contract under both the United States Constitution and the California State Constitution.

On August 24, 1998, Fireman's Fund, joined by Unigard, moved for a preliminary injunction prohibiting Lodi from enforcing MERLO. While the Insurers' preliminary injunction motion was pending, Lodi and its officers moved, in both actions, to dismiss the Insurers' complaints pursuant to Federal Rule of Civil Procedure 12(b)(1) for lack of subject matter jurisdiction, and Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim. At the same time, Fireman's Fund filed a motion for partial summary judgment and for a permanent injunction to enjoin Lodi from enforcing MERLO.

After extensive briefing by all parties, the district court held a joint hearing on all motions in both cases on December 4, 1998. Following the hearing, the district court issued two written decisions—one in the Unigard action and a second in the Fireman's Fund action.[10]

### 2. The Unigard Decision

In an unpublished decision filed on March 5, 1998, the district court found

---

9. Additional individual defendants Steven H. Doto, John R. Till, Bret A. Stone, and Adam L. Babich were dismissed without prejudice by stipulation of the parties on September 21, 1998.

10. We note that the district court did an admirable job in sorting through the varied and difficult issues raised in this highly complex case.

Unigard's claims ripe for review because "the content of [MERLO] is clear as are the City's intentions to enforce the Ordinance against Unigard." *Unigard Ins. Co. v. City of Lodi*, No. Civ. S. 98–1712–FCD–JFM at *5 (E.D.Cal. Mar. 5, 1998). The district court also found that Unigard has standing to bring the present action, *id.* at 6, and that MERLO is not preempted by CERCLA, *id.* at 6–13. Finally, the district court abstained under the *Pullman* abstention doctrine [11] from deciding whether MERLO was preempted by state law. *Id.* at 14–15. Based on these rulings, the district court granted Lodi's motion to dismiss Unigard's federal preemption claim and dismissed without prejudice Unigard's state preemption and federal contracts clause claims. Unigard timely appeals the district court's ruling concerning only the federal preemption issue.

### 3. The Fireman's Fund Decision

In a published opinion filed on February 25, 1999, the district court dismissed Fireman's Fund's claims against the individual defendants in their official capacities as "duplicative of the claims against the City." *Fireman's Fund Ins. Co. v. City of Lodi*, 41 F.Supp.2d 1100, 1106 (E.D.Cal. 1999). The district court also held that the defendants sued in their individual capacities are entitled to qualified immunity. *Id.* at 1107. The rulings on the remaining issues—including ripeness, standing, and federal and state preemption—were identical to those rulings in the Unigard action. *Id.* at 1107–13. The district court found that: (1) Fireman's Fund's claims are ripe; (2) Fireman's Fund has standing to bring the instant action; and (3) MERLO is not preempted by CERCLA. Again, the district court abstained from deciding whether MERLO is preempted by HSAA based on the doctrine of *Pullman* abstention.

Based on these rulings, the district court denied Fireman's Fund's motion for partial summary judgment and a permanent injunction, dismissed the individual defendants and the Law Firm from the action, dismissed the federal preemption claim against Lodi, and abstained from ruling on the state preemption claim. The district court dismissed the state preemption and remaining constitutional claims without prejudice.

Fireman's Fund timely appeals the district court's rulings concerning federal and state preemption, and the district court's dismissal of the official capacity claims against the individual defendants.[12]

## II.

### STANDARD OF REVIEW

■ We review de novo a district court's decision to grant or deny a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6). *Gonzalez v. Metropolitan Transp. Auth.*, 174 F.3d 1016, 1018 (9th Cir.1999). In reviewing the com-

---

**11.** The *Pullman* abstention doctrine derives its name from the case of *Railroad Commission of Texas v. Pullman Co.*, 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941), and is "an equitable doctrine that allows federal courts to refrain from deciding sensitive federal constitutional questions when state law issues may moot or narrow the constitutional questions." *The San Remo Hotel v. City of San Francisco*, 145 F.3d 1095, 1104 (9th Cir. 1998). *Pullman* abstention is discussed in greater detail at Section IV. A. *infra*.

**12.** In the event that we were to affirm the district court's decision to abstain from the state law preemption question, Fireman's Fund also urges us to certify the state preemption issue to the California Supreme Court. Because we reverse the district court's invocation of the *Pullman* abstention doctrine, we need not consider whether certification is appropriate.

plaint, all factual allegations "are taken as true and construed in the light most favorable to [p]laintiffs." *Epstein v. Washington Energy Co.*, 83 F.3d 1136, 1140 (9th Cir.1999).

■ Similarly, we review de novo whether this case meets the requirements of the *Pullman* abstention doctrine. *Martinez v. Newport Beach City*, 125 F.3d 777, 780 (9th Cir.1997). The district court has no discretion to abstain in cases that do not meet the requirements of the abstention doctrine being invoked. *Id.* If the requirements for *Pullman* abstention are satisfied, we review for an abuse of discretion the district court's decision to abstain from deciding the state law preemption question. *Id.*

### III.

### STATUTORY OVERVIEW

Before reaching the merits of the Insurers' arguments on appeal, because of the complexity of the claims involved in this case, it is useful to review briefly the three statutory schemes that are germane to this lawsuit: (1) CERCLA, the primary federal statute dealing with the cleanup of hazardous waste; (2) HSAA, the primary state statute dealing with the cleanup of hazardous waste in the State of California; and (3) MERLO, the Lodi ordinance at issue in this case.

### A. CERCLA

■ Congress enacted CERCLA in 1980 "to provide a mechanism for the prompt and efficient cleanup of hazardous waste sites." *United States v. City of Denver*, 100 F.3d 1509, 1511 (10th Cir. 1996). CERCLA has two overriding objectives: facilitating the timely cleanup of hazardous waste sites and making polluters pay for the damage that they caused. *Stanton Road Assoc. v. Lohrey Enter.*, 984 F.2d 1015, 1019 (9th Cir.1993).

■ CERCLA directs the EPA to produce a National Priorities List ("the List"), which contains those sites that the EPA has determined are most in need of remediation.[13] 42 U.S.C. § 9605(a)(8)(B) (1994); *see also ARCO Envtl. Remediation, L.L.C v. Dep't of Health and Envtl. Quality*, 213 F.3d 1108, 1111 n. 2 (9th Cir.2000). Only listed sites are eligible to receive federal Superfund dollars. *See State of New York v. Shore Realty Corp.*, 759 F.2d 1032, 1046 (2d Cir.1985). As of the date of this opinion, the EPA has not included the Lodi Groundwater site on the List.

Once the EPA includes a certain hazardous waste site on the List, CERCLA directs the EPA to prepare a Remedial Investigation and Feasibility Study to "define the nature and extent of the threat ... and to evaluate proposed remedies." *United States v. Akzo Coatings of Am., Inc.*, 949 F.2d 1409, 1417 (6th Cir.1991). If the EPA determines that CERCLA requires remediation of the site, "it must publish a proposed remedial action plan ... and provide an opportunity for [public] comment. The EPA then issues a Record of Decision ... setting forth the

---

**13.** Specifically, 42 U.S.C. § 9605(a)(8)(B) (1994) states:

[B]ased upon the criteria set forth in [the National Contingency Plan or NCP], the President shall list as part of the plan national priorities among the known releases or threatened releases throughout the United States and shall revise the list no less often than annually. [E]ach State shall establish and submit for consideration by the President priorities for remedial action among known releases and potential releases in that State based upon the criteria set forth in [the NCP]. In assembling or revising the national list, the President shall consider any priorities established by the States....

42 U.S.C. § 9605(a)(8)(B).

remedy selected for the site." *Id.* (citations omitted).

CERCLA permits the cleanup efforts to be financed in one of two ways:

> First, the PRPs are usually given the option of entering into a settlement agreement with the EPA.... The agreement, which is in the form of a consent decree, consists of a promise by the settling PRPs to perform and finance the cleanup action themselves.... Second, in situations where the the PRPs fail to settle with the EPA, the EPA may then intervene and commence the cleanup itself. The EPA's cleanup action is financed through the use of monies allocated to the Superfund. After the response action has been completed, the EPA seeks recovery of all the cleanup costs from the PRPs under the cost recovery provisions of CERCLA.

Peter F. Sexton, *Super Fund Settlements: The EPA's Role,* 20 Conn. L.Rev. 923, 925 (1988) (footnotes omitted); *see also 3550 Stevens Creek Assoc. v. Barclays Bank of California,* 915 F.2d 1355, 1357 (9th Cir. 1990).

"In order to be held liable for cleanup costs under CERCLA, a party must fall within one of the four classes of PRPs identified in 42 U.S.C. § 9607(a)(1)-(4)": (1) current owners and operators of hazardous waste facilities; (2) former owners and operators of hazardous waste facilities; (3) any person who arranged or arranges for the disposal or treatment of hazardous waste; and (4) any person who accepted or accepts hazardous waste for the purpose of transporting it to a disposal facility. Bancroft–Whitney, California Civil Practice, *Environmental Litigation,* § 3:28 (1993);

42 U.S.C. § 9607(a)(1)-(4); 40 C.F.R. § 35.6015(a)(32).

We have interpreted CERCLA to hold PRPs strictly liable for the investigation and remediation of hazardous waste sites. Moreover, like many of our sister circuits, we have also held that CERCLA liability is joint and several. *Atchison Topeka & Santa Fe Ry. Co. v. Brown & Bryant, Inc.,* 159 F.3d 358, 362 (9th Cir.1998). This means that

> all PRPs are assigned liability for the whole amount of the cleanup costs, and then permitted to allocate the costs amongst themselves, and other unnamed, but responsible parties. The rationale for joint and several liability is to create an incentive for named PRPs to search out other PRPs, so as to make all responsible polluters pay for cleanups.

Sarah W. Rubinstein, *CERCLA's Contribution to the Federal Brownfields Problem: A Proposal for Federal Reform,* 4 U. Chi. Sch. Roundtable 149, 152 (1997). Although there are circumstances under which municipalities may be considered PRPs under CERCLA's liability scheme, *see, e.g., City of Fresno v. NL Indust.,* 1995 WL 641983 (E.D.Cal.1995), it is not clear whether a municipality may be considered a PRP solely as a result of operating a municipal sewer system. *Compare Lincoln Prop., Ltd. v. Higgins,* 823 F.Supp. 1528, 1538, 1539–44 (E.D.Cal.1992) (holding that a municipal sewer system that leaked hazardous waste could rely on a third-party defense to avoid liability under CERCLA), *with Westfarm Assoc. Ltd. P'ship v. Washington Suburban Sanitary Comm'n,* 66 F.3d 669, 675–80 (4th Cir. 1995) (holding that a municipal sewer system is liable for the acts of a third party that discharged hazardous waste into the system).[14]

---

**14.** *See also generally* David B. Dornak, *Municipal Sewer System Operator is Subject to Lia-* *bility Under the Comprehensive Environmental Response, Compensation, and Liability Act,* 5

Under CERCLA, the cleanup of listed hazardous waste sites must be consistent with the National Contingency Plan ("NCP"). The NCP is promulgated by the EPA, and "specifies the roles of the federal and state governments in responding to hazardous waste sites, and establishes the procedures for making cleanup decisions." *City of Denver*, 100 F.3d at 1511. The burden of establishing that the cleanup process is consistent with the NCP depends on whether the plaintiff in a CERCLA action is the government or a private party: "While the United States government, or a[S]tate or Indian tribe, can obtain 'all costs of removal or remedial action ... *not inconsistent* with the [NCP],' any other person can obtain 'other *necessary* costs of response ... *consistent with* the [NCP].'" *Washington State Dep't of Transp. v. Washington Natural Gas Co.*, 59 F.3d 793, 799 (9th Cir.1995) (citing 42 U.S.C. § 9607(a)(2), (a)(4)(A)-(B)) (emphasis added). In other words, where "the United States government, a[S]tate, or an Indian tribe is seeking recovery of response costs, consistency with the NCP is *presumed*," and the burden is on the defendant to rebut the presumption of consistency by establishing that the plaintiff's response action was arbitrary and capricious. *Id.* However, "any 'other person' seeking response costs under [CERCLA] must prove that its actions are consistent with the NCP." *Id.*

CERCLA was amended in 1986 by the Superfund Amendments and Reauthorization Act of 1986 ("SARA"), 42 U.S.C. §§ 9601–9675. SARA strengthened CERCLA in two significant ways. First, SARA codified a statutory right of contribution among PRPs. Under SARA, "[a]ny person may seek contribution from any other person who is liable or potentially liable under [CERCLA as a PRP]." 42 U.S.C. § 9613(f)(1). "In resolving contribution claims, the court may allocate response costs among liable parties using such equitable factors as the court determines are appropriate." *Id.*

Second, SARA codified various incentives to encourage PRPs to settle quickly with the EPA. *See Bedford Affiliates v. Sills*, 156 F.3d 416, 427 (2d Cir.1998). Under SARA, PRPs "who choose to settle are granted protection from contribution actions being asserted against them under [CERLCA], but retain the right to bring contribution actions against other non-settling parties." *Id.* (citing 42 U.S.C. § 9613(f)(3)(B)). "[SARA] further provides that the amount recoverable from the remaining non-settling parties is reduced only by the amount of the settlement." *Id.* (citing 42 U.S.C. § 9613(f)(2)). "Hence, [PRPs] who choose to settle gain protection from contribution, enjoy potentially favorable settlement terms, and retain the ability to seek contribution from other defendants. Those responsible parties who choose not to settle are barred from seeking contribution from the settling parties and thereby face potentially disproportionate liability." *Id.* (citing *In re Reading Co.*, 115 F.3d 1111, 1119 (3rd Cir.1997)); *see also* 42 U.S.C. § 9622(h)(4).[15]

---

S.C. Envtl. L.J. 98 (1996); Robert M. Frye, Note, *Municipal Sewer Authority Liability Under CERCLA: Should Taxpayers be Liable for Superfund Cleanup Costs? Westfarm Associates Limited Partnership v. International Fabric Institute*, 14 Stan. Envtl. L.J. 61 (1995).

**15.** 42 U.S.C. § 9622(h)(4) provides: "A person who has resolved its liability to the United States under this subsection shall not be liable for claims for contribution regarding matters addressed in the settlement. Such settlement shall not discharge any of the other potentially liable persons unless its terms so provide, but it reduces the potential liability of the others by the amount of the settlement."

## B. HSAA

██ HSAA, which is commonly referred to as the "State Superfund Law," mirrors CERCLA in many respects. *Acme Fill Corp. v. Althin CD Med., Inc.*, 1995 WL 822665 at \*5 (N.D.Cal.1995). Like CERCLA, HSAA "imposes cleanup obligations and provides private cost recovery rights substantially identical to those obligations imposed and rights granted under CERCLA." Donna R. Black, *Potential Environmental Liabilities in Corporate Acquisitions*, 894 PLI/Corp 543, 546 (June–July 1995). HSAA also relies on CERCLA's definition of PRPs. Bruce P. Howard, et al., *CERCLA and Similar State Laws: Overview and Recent Developments*, 832 PLI/Corp 531, 551(Dec.-Jan.1993). However, HSAA differs from CERCLA in that "HSAA liability may be apportioned according to fault," whereas liability under CERCLA is joint and several. *Id.*

HSAA is administered by DTSC, which employs a listing process similar to that used by the EPA at the federal level. As discussed above, DTSC listed the Lodi Groundwater Site as a hazardous waste site beginning in fiscal year 1993–94.

## C. MERLO

MERLO is modeled on both CERCLA and HSAA, and was adopted by Lodi with the full cooperation and encouragement of the Department of Toxic Substances Control ("DTSC"). MERLO incorporates many of the standards employed by CERCLA and HSAA. For example, MERLO utilizes the CERCLA and HSAA definition of who may be considered a PRP, *see* MERLO § 8.24.040(A)(1), and, like CERCLA, the scope of liability under MERLO is joint and several, *see* MERLO § 8.24.040(F).

Lodi asserts that it enacted MERLO to empower the City—the governmental entity most intimately connected with the soil and groundwater contamination—to facilitate and oversee the remediation of its soil and groundwater. The Insurers allege, however, that Lodi enacted MERLO to avoid paying its fair share as a PRP for remediating the PCE contamination. According to the Insurers, Lodi is properly considered a PRP because the City's poorly designed and maintained sewer system allowed the PCE-contaminated wastewater to migrate easily throughout the region. Lodi disputes these assertions. According to Lodi, "the City does not concede that it is a potentially responsible party at this site merely because hazardous substances discharged into its sewers by other parties leaked out into the environment."

## IV.

## ANALYSIS

On appeal, Fireman's Fund asserts that the district court erred in abstaining from deciding whether MERLO is preempted by various state laws, and Fireman's Fund and Unigard argue that MERLO is in fact preempted by state and federal law. We find that the district court erred in abstaining from deciding whether MERLO is preempted by state law. Because the state law preemption analysis resembles the federal preemption analysis, we consider whether MERLO is preempted by federal law in conjunction with the state law preemption question. We conclude by finding that although a few sections of MERLO are preempted by state and federal law under the doctrine of conflict preemption, the majority of the Insurers' preemption arguments lack merit.

In addition, Fireman's Fund appeals the district court's decision dismissing its official capacity claims against three individual defendants. We agree with Fireman's Fund and reinstate those claims.

## A. ABSTENTION

Fireman's Fund first argues that the district court erred in abstaining from deciding its state preemption claim, and in dismissing its remaining federal and state constitutional claims on this basis. We agree.

■ The district court decided *sua sponte* not to exercise its jurisdiction over Fireman's Fund's state law preemption claim under the doctrine of *Pullman* abstention. First articulated by the Supreme Court in *Railroad Comm'n of Tex. v. Pullman Co.*, 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941), "*Pullman* abstention is an equitable doctrine that allows federal courts to refrain from deciding sensitive federal constitutional questions when state law issues may moot or narrow the constitutional questions." *The San Remo Hotel*, 145 F.3d at 1104. Like all abstention doctrines, *Pullman* abstention "is an extraordinary and narrow exception to the duty of a district court to adjudicate a controversy" properly before it. *Canton v. Spokane Sch. Dist. # 81*, 498 F.2d 840, 845 (9th Cir.1974) (citing *Allegheny County v. Frank Mashuda Co.*, 360 U.S. 185, 188, 79 S.Ct. 1060, 3 L.Ed.2d 1163 (1959)).

■ Three factors must be present before a district court may abstain under the *Pullman* doctrine: "(1) the complaint must involve a 'sensitive area of social policy' that is best left to the states to address; (2) 'a definitive ruling on the state issues by a state court could obviate the need for [federal] constitutional adjudication by the federal court';[16] and (3) 'the proper resolution of the potentially determinative state law issue is uncertain.'" *Cedar Shake and Shingle Bureau v. City of Los Angeles*, 997 F.2d 620, 622 (9th Cir.1993) (quoting *Kollsman v. City of Los Angeles*, 737 F.2d 830, 833 (9th Cir.1984)). If a court invokes *Pullman* abstention, it should stay the federal constitutional question "until the matter has been sent to state court for a determination of the uncertain state law issue." Erwin Chemerinsky, *Federal Jurisdiction*, § 12.2.1, at 737 (3d ed.1999).[17]

■ The district court concluded that all three *Pullman* factors were present in this case. Upon careful review, however, we find that both the first and third factors are lacking. Because there is no discretion to abstain in cases that do not meet the requirements of the abstention doctrine being invoked, *Martinez*, 125 F.3d at 780, we hold that the district court erred in abstaining from ruling on Fireman's Funds' state law preemption claim.

**16.** We have held that *Pullman* abstention is not appropriate when the federal question at stake is one of federal preemption because preemption is not considered a "constitutional issue." *Hotel Employees and Rest. Employees Int'l Union v. Nevada Gaming Comm'n*, 984 F.2d 1507, 1512 (9th Cir.1993) ("*Pullman* abstention is not appropriate because preemption is not a constitutional issue."). *But see International Bhd. of Elec. Workers, Local Union No. 1245 v. Public Serv. Comm'n of Nev.*, 614 F.2d 206 (9th Cir.1980) (invoking *Pullman* abstention in a case involving preemption under the National Labor Relations Act). In this case, however, the district court properly addressed the merits of the Insurers' federal preemption claims, and invoked *Pull-*

*man* abstention only to avoid reaching Fireman's Fund's additional claims for relief based on the Due Process, Equal Protection, and Contracts Clauses of the U.S. Constitution.

**17.** Both Fireman's Fund and Lodi agree that the even if the district court did not err in abstaining, it erred in dismissing the Fireman's Fund's remaining federal and state constitutional claims; the district court instead should have stayed the action and retained jurisdiction over the remaining federal claims pending resolution of the relevant state law issues in state court. *See International Bhd. of Elec. Workers*, 614 F.2d at 213.

As set forth above, the first *Pullman* factor requires us to find that "the complaint ... involve[s] a sensitive area of social policy that is best left to the states to address." *Cedar Shake and Shingle Bureau*, 997 F.2d at 622 (internal quotation omitted). The district court found that this factor was satisfied because this case involves "an area of serious local concern about which the DTSC has expressed no opinion and into which federal intrusion is undesirable." *Fireman's Fund*, 41 F.Supp.2d at 1112. We respectfully disagree. Although "the interpretation of a local ordinance which enables the City to pay for hazardous waste remediation it could not otherwise afford" is undoubtedly an area of "serious local concern," it cannot truly be said that "federal intrusion is undesirable." *Id.* Indeed, the federal government has definitively entered the field of hazardous waste remediation by enacting CERCLA. Moreover, the text of CERCLA makes clear that Congress envisioned a partnership between various levels of government in addressing the complex and costly problems associated with hazardous waste remediation. *See, e.g.,* 42 U.S.C. §§ 9614(a), 9652(d), 9659(h).[18]

In addition, although DTSC has not issued a formal written opinion regarding MERLO, it cannot truly be said that "DTSC has expressed no opinion" about the Lodi ordinance. *Fireman's Fund*, 41 F.Supp.2d at 1112. On the contrary, by entering into the Cooperative Agreement with Lodi, DTSC implicitly approved of the City's efforts to enact MERLO. Indeed, the Cooperative Agreement itself obligated Lodi to adopt MERLO as part of its municipal remediation strategy. Specifically, under the terms of the Agreement, Lodi agreed to:

> utiliz[e], as appropriate, the full range of its remedial and regulatory injunctive and cost recovery authority under federal, state and municipal law, to compel the complete, timely, competent, cost-effective performance of the Work in full compliance with federal, state and local law, specifically including the NCP, as appropriate. These enforcement efforts will include ... *the prompt enactment and enforcement of a comprehensive municipal environmental response ordinance which shall enact into municipal law additional legal authorities* to appropriately supplement the City of Lodi's already extensive environmental response authority under federal, state and local law. . . .

(emphasis added). Thus, MERLO was enacted with the full cooperation and encouragement of DTSC.[19] We therefore find that

---

18. We also note that although HSAA is not identical to CERCLA, it mirrors CERCLA in many respects. It therefore seems inconsistent to consider the Insurers' federal preemption claims, while at the same time abstaining from the related state law preemption claims. *Cf. Wisconsin v. Constantineau*, 400 U.S. 433, 439, 91 S.Ct. 507, 27 L.Ed.2d 515 (1971) (holding that *Pullman* abstention should not be invoked to avoid interpreting state law constitutional questions when the provision of the state constitution at issue mirrors a provision of the federal constitution). *But see Fields v. Rockdale County*, 785 F.2d 1558 (11th Cir.1986) (finding that *Pullman* abstention is proper if the state constitution provides greater protections than exist under the feder-

al Constitution, even if the state and federal provisions at issue are mirror images of each other).

19. DTSC had the authority to enter into the Cooperation Agreement under HSAA. As the Agreement itself states, DTSC entered into the Agreement "pursuant to its authority as set forth in Chapters 6.5 and 6.8 of the California Health and Safety Code [the HSAA], as well as its inherent governmental authority to resolve claims within its jurisdiction." *See also* Cal. H & S Code § 25355.5(a)(1)(C) (authorizing DTSC to enter into "agreements" with PRPs or "other parties"); Cal. H & S Code § 25358.3.

the district court erred in concluding that the first *Pullman* abstention factor has been satisfied in this case.

Although our finding that the first *Pullman* factor has not been satisfied is sufficient to support our decision to reverse the district court on this issue, we note that the third *Pullman* abstention factor is also lacking in this case. As set forth above, the third *Pullman* factor requires us to find that "the proper resolution of the potentially determinative state law issue is uncertain.'" *Cedar Shake and Shingle Bureau,* 997 F.2d at 622 (internal quotation and citation omitted). The district court concluded that the determinative state law issue in this case is whether MERLO is preempted by state law because it duplicates or contradicts HSAA. *Fireman's Fund,* 41 F.Supp.2d at 1112–13. The district court ultimately found that because "California courts have not spoken definitively in this matter," the third *Pullman* factor has been satisfied. *Id.* at 1113. Again, we respectfully disagree.

■■ The fact that a state court has not ruled on the precise issue at stake in this case does not mean that the proper resolution of the state law issue is "uncertain." *Constantineau,* 400 U.S. at 439, 91 S.Ct. 507; *see also Pearl Invest. Co. v. City & County of San Francisco,* 774 F.2d 1460, 1465 (9th Cir.1985) (holding that uncertainty for Pullman abstention means that a federal court cannot predict with any confidence how a state's highest court would decide an issue of state law). On the contrary, California has left several guideposts to assist us with the state law preemption analysis. First, the California Supreme Court has provided us with guidance in determining when a local regulation is preempted by state law. *See, e.g., People ex rel. Deukmejian v. County of Mendocino,* 36 Cal.3d 476, 485, 204 Cal. Rptr. 897, 683 P.2d 1150 (1984). Second,

HSAA itself provides us with substantial guidance by expressly recognizing the continuing viability of supplementary municipal legislation. *See, e.g.,* Cal. H & S Code § 25356.6(a).

Finally, we also have the additional benefit of a recent decision by the California Supreme Court that relates to the present litigation. On July 24, 2000, after the district court's decision in the present case, the California Supreme Court decided *Connecticut Indemnity Co. v. Superior Court,* 23 Cal.4th 807, 98 Cal.Rptr.2d 221, 3 P.3d 868 (2000), a case in which Fireman's Fund and other insurers of PRPs challenged Lodi's decision to issue legislative subpoenas pursuant to its authority under MERLO. *Id.* at 226–28, 3 P.3d 868. Specifically, Fireman's Fund argued that Lodi exceeded its authority under state law in issuing the subpoenas. Fireman's Fund also argued that Lodi issued the subpoenas for an improper purpose, i.e., as a tool to gather sufficient information to file suit against the PRPs and their insurers.

The California Supreme Court upheld Lodi's authority under MERLO to issue the legislative subpoenas. Speaking for a unanimous court, Chief Justice George stated that:

[C]ontrolling authority establishes that a city may issue legislative subpoenas when it has been authorized by ordinance or similar enactment to do so, when issuance of the subpoenas serves a valid legislative purpose, and when the witnesses or material subpoenaed are pertinent to the subject matter of a legislative investigation. We conclude ... that the city satisfied these requirements in this case.

*Id.* at 223, 3 P.3d 868. In so holding, the California Supreme Court specifically found that:

The subject matter of the [City's] investigation, an environmental public nuisance amounting to, as the trial court put it, "a tremendous and serious groundwater contamination problem" within Lodi's city limits, obviously is an area over which the city council has authority and responsibility both to legislate and to appropriate.

\* \* \* \* \* \*

As has been observed, " '[i]t is difficult to imagine any interest that [a legislative entity] could have that would be more compelling ... than its interest in determining the availability of funds for the cleanup of hazardous substances located within its boundaries.' " We find Lodi's asserted legislative interests to be legitimate, and not mere pretext or sham.

*Id.* at 226–27, 3 P.3d 868 (quoting *Ford Motor Co. v. Insurance Co. of North Am.*, 35 Cal.App.4th 604, 41 Cal.Rptr.2d 342, 348 (1995)). Thus, the California Supreme Court has acknowledged the serious nature of Lodi's groundwater contamination problem and has generally affirmed the authority and responsibility of Lodi to regulate this contamination as an "environmental public nuisance." *Id.* at 226, 3 P.3d 868.[20]

Because we are not without guidance from the state courts in addressing the state law preemption question, we find that the third *Pullman* abstention factor is not satisfied in this case. What is more, the third *Pullman* factor is not satisfied for the additional reason that we cannot say that there is a "reasonable possibility that the state court's clarification of state law might obviate the need for the federal constitutional ruling." Chemerinsky, *supra*, at 742–43. On the contrary, we are confident that a definitive decision from the state court on the state-law preemption question would do little to relieve us of our duty to resolve the federal constitutional issues in this case.

First, as discussed in Section IV.B.3. *infra*, it is fairly clear that MERLO as a whole is consistent with state law, and that municipalities in California may enact local ordinances which allow them to take an active role in remediating local hazardous waste contamination.[21] Second, even if the state court were to find, as we do *infra*, that a few specific provisions of MERLO are preempted, such a finding would only invalidate those specific provisions. The bulk of MERLO would remain in effect, as would our obligation to consider Fireman's Funds' federal constitutional claims. *Pullman* abstention is therefore inappropriate.

20. We also note a recent decision by the Sacramento Superior Court in a case that is related to the present litigation. On October 11, 2000, the Superior Court for the County of Sacramento issued a decision in *People v. Randtron*, Case No. 99AS02335. As in the present case, the court was asked to determine whether MERLO is preempted by CERCLA or HSAA. With respect to the federal preemption question, the court "adopt[ed] and [found] persuasive" the district court's analysis in the present case. The court therefore held that MERLO is not preempted by CERCLA.

Significantly, the Sacramento Superior Court also went on to conclude that MERLO is not preempted by HSAA. Indeed, the court found that HSAA does not expressly preempt municipal ordinances, that HSAA does not preempt the field by implication, and that under the circumstances of this case, there is also no conflict preemption and no duplication. *Randtron* is currently pending before the California Court of Appeals.

21. Our discussion of the third *Pullman* abstention factor is necessarily forward-looking because the question whether there is a "reasonable possibility that the state court's clarification of state law might obviate the need for the federal constitutional ruling" anticipates the merits of the preemption analysis. Chemerinsky, *supra*, at 742–43.

In sum, because we find that both the first and the third *Pullman* factors are lacking, we reverse the district court's decision to abstain from deciding Fireman's Fund's state law preemption claim. We proceed now to the merits of the federal and state preemption analysis.

## B. PREEMPTION

Fireman's Fund argues that MERLO is preempted by state law. In addition, both Fireman's Fund and Unigard argue that MERLO is preempted by federal law. After briefly reviewing the doctrines of federal and state preemption, we consider each of the Insurers' preemption arguments in turn.[22]

### 1. Overview of Federal Preemption

Under the Supremacy Clause of the United States Constitution, state laws that "interfere with, or are contrary to the laws of Congress" are preempted and are therefore invalid. *Gibbons v. Ogden*, 22 U.S. (9 Wheat) 1, 211, 6 L.Ed. 23 (1824). "Congressional intent governs our determination of whether federal law preempts state law. If Congress so intends, '[p]re-emption ... is. compelled whether Congress' command is explicitly stated in the statute's language or implicitly contained in its structure and purpose." *Boyes v. Shell Oil Prods. Co.*, 199 F.3d 1260, 1267 (11th Cir.2000) (quoting *Gade v. National Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 96, 112 S.Ct. 2374, 120 L.Ed.2d 73 (1992) (plurality)).

The Supreme Court has recognized three types of federal preemption:

(1) *express preemption*, where the statute contains "explicit pre-emptive language," (2) *field preemption*, "where the scheme of federal regulation is so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it," and (3) *conflict preemption*, "where compliance with both federal and state regulations is a physical impossibility, or where state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress."

*Id.* (citing *Gade*, 505 U.S. at 96, 112 S.Ct. 2374 (emphasis added)). "Although these categories provide a useful analytic framework, they are not 'rigidly distinct.'" *Industrial Truck Ass'n v. Henry*, 125 F.3d 1305, 1309 (9th Cir.1997).

"When considering [preemption], 'we start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress.'" *Wisconsin Pub. Intervenor v. Mortier*, 501 U.S. 597, 604, 111 S.Ct. 2476, 115 L.Ed.2d 532 (1991) (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230, 67 S.Ct. 1146, 91 L.Ed. 1447 (1947)). Moreover, we are "highly deferential" to local legislation in areas such as environmental regulation, which "traditionally has been a matter of state

---

**22.** Because the district court abstained, it did not consider the merits of Fireman's Fund's state law preemption claim. "Although we ordinarily do[ ] not consider an issue not passed upon below, the decision to resolve a question for the first time on appeal is one left primarily to the discretion of the courts of appeals." *City of Auburn v. Qwest Corp.*, 260 F.3d 1160, 1173 (9th Cir.2001). We have recognized an exception to the general rule that we will not consider an issue for the first time on appeal if "the issue presented is purely one of law and either does not depend on the factual record developed below, or the pertinent record has been fully developed." *Bolker v. Commissioner of Internal Revenue*, 760 F.2d 1039, 1042 (9th Cir.1985); *see also Franklin v. Foxworth*, 31 F.3d 873, 878–79 (9th Cir.1994) (Reinhard, J., concurring). Because that exception applies in this case, we proceed to the merits of Fireman's Fund's state preemption claim.

authority." *Exxon Mobil Corp. v. United States Env't Prot. Agency*, 217 F.3d 1246, 1255 (9th Cir.2000). Finally, "for [ ] purposes of the Supremacy Clause, the constitutionality of local ordinances is analyzed the same way as that of statewide laws." *Hillsborough County v. Automated Med. Labs., Inc.*, 471 U.S. 707, 713, 105 S.Ct. 2371, 85 L.Ed.2d 714 (1985) (internal citations omitted).

## 2. Overview of State Preemption

California preemption doctrine is based on Article XI, section 7 of the California Constitution, which states that "[a] county or city may make and enforce within its limits all local, police, sanitary, and other ordinances and regulations *not in conflict* with general laws." Cal. Const., art. XI, § 7 (emphasis added); *Sherwin–Williams Co. v. City of Los Angeles*, 4 Cal.4th 893, 16 Cal.Rptr.2d 215, 217, 844 P.2d 534 (1993). The California Supreme Court has held that State law is "in conflict with" or preempts local law if the local law "duplicates, contradicts, or enters an area fully occupied by general law, either expressly or by legislative implication." *Sherwin–Williams*, 16 Cal.Rptr.2d. at 217, 844 P.2d 534. As the court further explained:

> Local legislation is "duplicative" of general law when it is coextensive therewith. Similarly, local legislation is "contradictory" to general law when it is inimical thereto. Finally, local legislation enters an area that is "fully occupied" by general law when the Legislature has expressly manifested its intent to "fully occupy" the area, or when it has impliedly done so ...

*Id.* at 218, 844 P.2d 534 (internal quotations and citations omitted). Thus, with the exception of the concept of preemption by duplication which has no federal analogue, California's preemption doctrine is similar to federal preemption law. With this background in mind, we proceed to the merits of the federal and state preemption analysis.

### 3. Preemption Analysis

#### a. Express Preemption

Neither CERCLA nor HSAA expressly preempts local law, and the Insurers do not argue otherwise. *Fireman's Fund*, 41 F.Supp.2d at 1109 (citing *Bedford Affiliates*, 156 F.3d at 426; *Witco Corp. v. Beekhuis*, 38 F.3d 682, 687 (3d Cir.1994); *Akzo Coatings*, 949 F.2d at 1455; *City of Denver*, 100 F.3d at 1512); *see also* Cal. H & S Code § 25356.6(a).

#### b. Field Preemption

Similarly, the Insurers do not argue that CERCLA alone preempts the field by implication. Indeed, as the Insurers acknowledge, CERCLA contains three separate savings clauses to preserve the ability of states to regulate in the field of hazardous waste cleanup. First, CERCLA § 114(a) states that "[n]othing in this chapter shall be construed or interpreted as preempting any State from imposing any additional liability or requirements with respect to the release of hazardous substances within such State." 42 U.S.C. § 9614(a). Second, CERCLA § 302(d) states that "[n]othing in this chapter shall affect or modify in any way the obligations or liabilities of any person under other Federal or State law, including common law, with respect to release of hazardous substances or other pollutants or contaminants...." 42 U.S.C. § 9652(d). And third, CERCLA § 310(h) states that "[t]his chapter does not affect or otherwise impair the rights of any person under Federal, State, or common law, except with respect to the timing of review as provided in section 9613(h)," a CERCLA provision that is not at issue in the present case. 42 U.S.C. § 9659(h). Based on these provi-

sions, courts have repeatedly held that "CERCLA does not completely occupy the field of environmental regulation." *ARCO*, 213 F.3d at 1114.[23]

■ Because the Insurers cannot argue that CERCLA alone occupies the field, the Insurers instead argue that CERCLA and HSAA, *together*, occupy the field. According to the Insurers, CERCLA explicitly authorizes *states*, but not *municipalities*, to impose additional requirements regarding the cleanup of hazardous substances. The Insurers therefore maintain that MERLO is preempted by the combined impact of CERCLA and HSAA under the doctrine of field preemption.

The district court rejected this argument. Relying on the Supreme Court's decision in *Wisconsin Public Intervenor v. Mortier*, 501 U.S. 597, 111 S.Ct. 2476, 115 L.Ed.2d 532 (1991), the district court held that the term "state" as used in CERCLA is broad enough to include political subdivisions such as Lodi. *Fireman's Fund*, 41 F.Supp.2d at 1110. As the district court explained, "the exclusion of political subdivisions cannot be inferred from [CERCLA's] express authorization to the 'State[s]' because political subdivisions are components of [states]." *Id.* (quoting *Mortier*, 501 U.S. at 608, 111 S.Ct. 2476). The district court further noted that because California could simply re-delegate its authority under CERCLA to Lodi, the fact that CERCLA does not specifically refer to political subdivisions is inconsequential. We agree with the district court.

The Insurers' argument is based on the premise that, by referring to states but not political subdivisions in the text of the statute, Congress intended CERCLA to leave room for supplemental state legislation, while at the same time, prohibiting supplemental municipal legislation. This premise is both contrary to the Supreme Court's ruling in *Mortier* and contrary to reason.

In *Mortier*, the Supreme Court considered whether the Federal Insecticide, Fungicide and Rodenticide Act ("FIFRA") preempted a local ordinance adopted by the city of Casey, Wisconsin. *Mortier*, 501 U.S. at 602, 111 S.Ct. 2476. The ordinance at issue required a permit "for the application of any pesticide to public lands, to private lands subject to public use, or for the aerial application of any pesticide to private lands." *Id.* When Casey prohibited Ralph Mortier from the aerial spraying of pesticides on certain property based on the local ordinance, Mortier filed suit alleging, *inter alia*, that the local pesticide ordinance was preempted by FIFRA. *Id.* at 603, 111 S.Ct. 2476.

The Supreme Court held that FIFRA does not preempt the Casey pesticide ordinance. In so holding, the Court began its analysis by noting that FIFRA expressly authorizes "State[s]" to regulate pesticides, but makes no reference in the savings clause to political subdivisions of states. *Id.* at 606–07, 111 S.Ct. 2476. The Court went on to find, however, that the term "State" is broad enough to encom-

---

**23.** In addition to these three sections, CERCLA § 106 implicitly recognizes the concurrent jurisdiction of the federal, state, and local governments to undertake abatement actions to clean up hazardous waste contamination. Section 106 states in pertinent part:

> In addition to any other action taken by a State or local government, when the President determines that there may be an immi-

nent and substantial endangerment to the public health or welfare or the environment because of an actual or threatened release of a hazardous substance from a facility, he may require the Attorney General of the United States to secure such relief as may be necessary to abate such danger or threat....

42 U.S.C. § 9606(a) (emphasis added).

pass political subdivisions, and that the fact that FIFRA is silent with respect to the power of local governments "cannot suffice to establish a clear and manifest purpose to preempt local authority." *Id.* at 607, 111 S.Ct. 2476 (internal quotation omitted). As the Court explained:

> The exclusion of political subdivisions cannot be inferred from the express authorization to the "State[s]" because political subdivisions are components of the very entity the statute empowers. Indeed, the more plausible reading of FIFRA's authorization to the States leaves the allocation of regulatory authority to the "absolute discretion" of the States themselves, including the option of leaving local regulation of pesticides in the hands of local authorities.

*Id.* at 608, 111 S.Ct. 2476.

We find that *Mortier*'s reasoning regarding FIFRA is equally applicable to CERCLA. Like FIFRA, CERCLA anticipates that states will enact supplemental remedial environmental legislation. *Accord Akzo Coatings,* 949 F.2d at 1454 ("CERCLA sets only a floor, not a ceiling, for environmental protection. Those state laws which establish more stringent environmental standards are not preempted by CERCLA."). Moreover, like FIFRA, the CERCLA savings clauses refer only to "State[s]," while CERCLA specifically refers to both states and political subdivisions in other provisions. *Compare* 42 U.S.C. § 9614(a) (referring only to "State[s]"), *with* 42 U.S.C. § 9606(a) (referring to "a State or local government").

CERCLA is also like FIFRA in that CERCLA does not preclude states from re-delegating their authority to political subdivisions. *Fireman's Fund,* 41 F.Supp.2d at 1110. Indeed, that is precisely what occurred in this case. Lodi specifically adopted MERLO pursuant to a Cooperative Agreement entered into by Lodi and DTSC, the state agency charged with interpreting and enforcing California's hazardous waste laws. Lodi's exercise of its municipal authority to provide for local nuisance abatement through the adoption of MERLO has therefore been sanctioned by the State of California.

■ Moreover, in California, municipal ordinances *are* state law and may be prosecuted in the name of the "people of the State of California." Cal. Gov't Code § 36900(a) (West 2001) ("Violations of a city ordinance is a misdemeanor unless by ordinance it is made an infraction. Such a violation may be prosecuted by city authorities in the name of the people of the State of California, or redressed by civil action."). In addition, the California Constitution provides Lodi and other cities with broad municipal authority to address local environmental nuisances, Cal. Const., Art. XI, § 7, and the California Legislature has adopted numerous laws authorizing political subdivisions to adopt ordinances for the protection of the environment. *See, e.g.,* Cal. Gov't Code § 38771 (West 2001) (providing cities with the authority to determine what constitutes a public nuisance); Cal. Gov't Code § 38773 (West 2001) (granting cities the authority to provide for the abatement of public nuisances).

Included among these state laws is HSAA, which the Insurers acknowledge is *not* preempted by CERCLA. HSAA's savings clause provides that with certain exceptions not applicable here, HSAA does not "affect or modify in any way the obligations or liabilities or any person under any other provision of *state* or federal laws." Cal. H & S Code § 25366 (emphasis added). Significantly, the phrase "state law" is defined in § 25326 to include municipalities. *See* Cal. H & S Code § 25326 ("A 'release authorized or permitted pursuant to state law' means any re-

lease into the environment which is authorized by statute, ordinance, regulation, or rule of any state, regional, or local agency or government ..." ). HSAA § 25351.2 also permits a "city or county" to "initiate a removal or remedial" HSAA enforcement action. Cal. H & S Code §·25351.2. Thus, HSAA itself contemplates the ability of cities to adopt parallel municipal environmental ordinances and participate in the process of hazardous waste remediation.

Under these circumstances, we agree with the district court that the term "State" as used in CERCLA is broad enough to include political subdivisions such as Lodi.[24] In the absence of a strong indication to the contrary, we fall back on the presumption that Congress did not intend CERCLA to "den[y] local communities throughout the Nation significant powers of self-protection." *Mortier*, 501 U.S. at 621, 111 S.Ct. 2476 (Scalia, J., concurring); *see also Western Oil and Gas Assoc. v. Monterey Bay Unified Air Pollution Control Dist.*, 49 Cal.3d 408, 261 Cal.Rptr. 384 393–94, 777 P.2d 157 (1989) ("In view of the long tradition of local regulation and the legislatively imposed duty [on local governments] to preserve and protect the public health, preemption may not be lightly found."). Although the Insurers urge us to hold that CERCLA preempts MERLO but not HSAA,[25] they fail to explain why Congress would preempt local environmental legislation without exclusively occupying the field and obtaining whatever uniformity benefits might flow from preemption. On the contrary, we find that the more plausible reading of CERCLA is that the statute leaves room for the creation of an arsenal of remedial environmental regulations through a comprehensive "partnership between federal, state *and* local governments." *Mortier*, 501 U.S. at 615, 111 S.Ct. 2476 (emphasis in original). (discussing FIFRA).

Accordingly, we hold that CERCLA permits both states and their political subdivisions to enact hazardous waste regulations and "pursue additional remedies at [their] own expense, as long as those remedies do not conflict or interfere with," *Akzo Coatings*, 949 F.2d at 1454, "the accomplishment and execution of [CERCLA's] full purpose and objective...." *Industrial Truck Ass'n*, 125 F.3d at 1309.

---

**24.** This conclusion is "consistent with the ordinary view that states are free to distribute regulatory power between themselves and their political subdivisions." *Deukmejian*, 204 Cal.Rptr. at 907, 683 P.2d 1150.

**25.** In support of their argument, the Insurers cite *City of Denver*, 100 F.3d at 1513, a case in which "the Tenth Circuit declined to apply *Mortier* when to do so would impede CERCLA's objective[s]...." *Fireman's Fund*, 41 F.Supp.2d at 1110 n. 6. Like the district court, we find *City of Denver* distinguishable from the present case.

In *City of Denver*, the federal EPA issued an order pursuant to CERCLA requiring the W.S. Shattuck Chemical Company ("Shattuck") to remediate a hazardous waste site that was listed on the NPL. *City of Denver*, 100 F.3d at 1511. Although Shattuck agreed to comply with the EPA's order, Denver issued a cease and desist order to Shattuck based on asserted violations of a Denver zoning ordinance. *Id.* at 1512. In response to Denver's cease and desist order, the EPA sought a declaratory judgment that Denver's cease and desist order was preempted by CERCLA. *Id.*

The Tenth Circuit rejected Denver's argument that *Mortier* somehow required the EPA to adopt and comply with Denver's municipal zoning regulation. As the Tenth Circuit stated, "[w]e will not apply *Mortier* in this context when to do so would produce a result so contrary to the overall objectives of CERCLA as expressed consistently in the Act itself...." *Id.* at 1513. In the present case, however, the application of *Mortier* is consistent with CERCLA's overall objective of promoting the prompt and efficient cleanup of hazardous waste. *City of Denver* is therefore distinguishable.

### c. Conflict Preemption

■ The Insurers next assert that CERCLA and HSAA preempt seven specific portions of MERLO under the doctrine of conflict preemption. As discussed above, we will find federal conflict preemption where "compliance with both the federal and state regulations is a physical impossibility," or when the state law stands as "an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *California Fed. Sav. and Loan Ass'n v. Guerra*, 479 U.S. 272, 281, 107 S.Ct. 683, 93 L.Ed.2d 613 (1987). Similarly, we will find conflict preemption under California law when a local ordinance prohibits conduct that is expressly authorized by state statute or authorizes conduct that is expressly prohibited by state general law. *Sports Comm. Dist. v. County of San Bernardino*, 113 Cal.App.3d 155, 159, 169 Cal.Rptr. 652 (1980).

The Insurers challenge the following seven sections of MERLO as preempted: (1) the MERLO section permitting Lodi to be compensated for damage to its natural resources; (2) the MERLO sections addressing the cleanup standard set forth in the NCP; (3) the MERLO section authorizing Lodi to gather certain information from PRPs and their insurers; (4) the MERLO sections defining "abatement action costs" to permit Lodi to recover attorney's fees and interest; (5) the MERLO section permitting Lodi to bring direct actions against insurers of PRPs; (6) MERLO's general liability scheme, including the sections of MERLO that provide for the joint and several liability of PRPs, and the sections setting forth the contribution rights of PRPs; and (7) MERLO's burden of proof for establishing a defense to liability.

### (1) Natural Resource Damages

■ MERLO § 8.24.040(A)(9)(c) states that PRPs shall be liable for "[d]amages for injury to, destruction of, or loss of *natural resources*, including the reasonable costs of assessing such injury, destruction, or loss resulting from the environmental nuisance." MERLO § 8.24.040(A)(9)(c) (emphasis added). The Insurers contend that this provision of MERLO is preempted by state and federal law because "under CERCLA and ... HSAA, a State must designate a city as its authorized representative before a city may seek natural resource damages." According to the Insurers, because Lodi has not been designated the "authorized representative" of the State of California, it cannot recover for damages to its natural resources. We disagree with this assertion.

"CERCLA includes mechanisms for restoring natural resources that have been destroyed as a result of hazardous waste dumping and discharge." Michael J. Wittke, Comment, *Municipal Recovery of Natural Resource Damages Under CERCLA*, 23 B.C. Envtl. Aff. L.Rev. 921, 925 (1996). One such mechanism is CERCLA § 107(f)(1), which provides states, federal agencies, and Indian Tribes with a federal cause of action to sue for damages to natural resources that they hold in trust for the public. *See* 42 U.S.C. §§ 9607(a)(4)(C), (f)(1). "Natural resource damages include injury or loss of land, fish, wildlife, biota, air, water, ground water, drinking water supplies, and other resources belonging to, managed by, or otherwise controlled by the United States or state or local governments." *State of Idaho v. Hanna Mining Co.*, 882 F.2d 392, 394 (9th Cir.1989) (citing 42 U.S.C. §§ 9601(6), 9601(16)).

Specifically, CERCLA § 107(f)(1) states that:

In the case of an injury to, destruction of, or loss of natural resources under [107(1)(4)(C)] liability shall be to the United States Government and to any State for natural resources within the State or belonging to, managed by, controlled by or appertaining to such State.... The President, or the authorized representative of any State, shall act on behalf of the public as trustee of such natural resources to recover for such damages.

42 U.S.C. § 9607(f)(1). CERCLA thus allows "the President of the United States or the Governor of a State to designate officials to act on behalf of the public as trustees for natural resources." *City of Toledo v. Beazer Materials and Servs., Inc.,* 833 F.Supp. 646, 650 (N.D.Ohio 1993). Similarly, under HSAA, the Governor of California or an "authorized representative" of the State may recover natural resources damages. Cal. H & S Code § 25352(c).

It is unnecessary for us to determine whether a municipality may recover under CERCLA for damage to its natural resources in the absence of being designated the authorized representative of a state.[26] Lodi does not assert that MERLO permits the City to sue for damages to its natural resources under CERCLA or HSAA. Rather, Lodi asserts that because "neither CERCLA nor ... HSAA purport to abrogate other causes of action, including common law actions, for damage to natural resources, including natural resources held in trust by ... municipalities," Lodi re-

mains free to enact local ordinances such as MERLO that permit the City to recover for damage to such resources. We agree with the City.

Notwithstanding any authority under CERCLA or HSAA that Lodi may acquire by delegation, Lodi retains its independent authority to protect its proprietary interest in natural resources held in trust by the City. We have held that although municipalities may not "sue as parens patriae [to protect their natural resources] because their power is derivative [of the state and] not sovereign," municipalities may " 'sue to vindicate such of their own *proprietary interests* as might be congruent with the interests of their inhabitants.' " *Colorado River Indian Tribes v. Town of Parker,* 776 F.2d 846, 848–49 (9th Cir.1985) (quoting *In re Multidistrict Vehicle Air Pollution M.D.L. No. 31,* 481 F.2d 122, 131 (9th Cir.1973)) (emphasis added). Consistent with this holding, we find that Lodi retains its authority under state law to protect its proprietary interest in its natural resources from damage. Moreover, to the extent that natural resources owned or held in trust by Lodi are damaged by environmental contamination, we find that nothing in CERCLA or HSAA prevents the City from suing under MERLO to recover for damage to such resources.

We therefore find that MERLO § 8.24.040(A)(9)(c) is not preempted by state or federal law.

---

**26.** Several district courts in other circuits have addressed this question, however. In the wake of the 1996 SARA amendments to CERCLA, these district courts have uniformly held that a municipality may not bring a CERCLA cause of action "as a public trustee" of a state's natural resources unless the municipality has been appointed by the governor of its respective state. *See, e.g., Borough of Sayreville v. Union Carbide Corp.,* 923 F.Supp. 671, 680–81 (D.N.J.1996); *Borough of Rockaway v. Klockner & Klockner,* 811 F.Supp. 1039, 1049–51 (D.N.J.1993); *City of Toledo v. Beazer Materials & Servs., Inc.,* 833 F.Supp. 646, 652 (N.D.Ohio 1993); *City of Heath v. Ashland Oil, Inc.,* 834 F.Supp. 971, 976–77 (S.D.Ohio 1993); *Town of Bedford v. Raytheon Co.,* 755 F.Supp. 469, 471–73 (D.Mass. 1991).

### (2) The National Contingency Plan ("NCP") Standard

The Insurers next argue that portions of MERLO §§ 8.24.030–040 conflict with CERCLA § 107(a)(4)(B) and HSAA § 25356, both of which address the cleanup standard set forth in the National Contingency Plan ("NCP").

Under CERCLA, the cleanup of listed hazardous waste sites must be consistent with the National Contingency Plan ("NCP")—a plan promulgated by the EPA that "specifies the roles" of the federal, state, and local governments "in responding to hazardous waste sites, and establishes the procedures for making cleanup decisions." [27] *City of Denver*, 100 F.3d at 1511. The burden of establishing that the cleanup process is consistent with the NCP depends on whether the plaintiff in a CERCLA action is the government or "any other person": "While the United States government, or a[S]tate or Indian tribe, can obtain 'all costs of removal or remedial action ... *not inconsistent* with the [NCP],' any other person can obtain 'other *necessary costs* of response ... *consistent with* the [NCP].'" *Washington State Dep't of Transp.*, 59 F.3d at 799 (quoting 42 U.S.C. § 9607(a)(2), (a)(4)(A)-(B)) (emphasis added). Thus, where "the United States government, a[S]tate, or an Indian tribe is seeking recovery of response costs, *consistency with the NCP is presumed*," and the burden is on the defendant to rebut the presumption of consistency by establishing that the plaintiff's response action was arbitrary and capricious. *Id.* (emphasis added). "In contrast, any 'other person' seeking response costs under [CERCLA] *must prove that its actions are consistent with the NCP.*" *Id.* (emphasis added).

HSAA incorporates the NCP standard by reference. Under HSAA § 25356.1.5, "[a]ny response action taken or approved pursuant to this chapter shall be based upon, and be no less stringent than ... [t]he requirements established under federal regulation pursuant to [the NCP]." Cal. H & S Code § 25356.1.5(a)(1).

The Insurers suggest two reasons why the provisions of MERLO addressing the NCP may be preempted. First, the Insurers argue that MERLO § 8.24.040(A)(9)(b) conflicts with CERCLA because it permits Lodi to recover from PRPs any "necessary costs of response incurred by the city" that are *"not inconsistent with the requirements of this chapter."* MERLO § 8.24.040(A)(9)(b) (emphasis added). The Insurers allege that even though this provision of MERLO does not specifically reference the NCP,[28] it was crafted to provide Lodi "the identical presumption of consistency with the NCP that CERCLA ... reserve[s] for the United States, States, and Indian Tribes."

In response to this assertion, Lodi argues that MERLO "does not purport to

---

**27.** It is noteworthy that "CERCLA calls for the NCP to include [ ] 'roles and responsibilities for the Federal, State, and local governments ... in effectuating the plan.' Therefore, the NCP does envision some role for local governments. In fact, the NCP counts on local governments, along with state governments, to participate in response actions and to take steps necessary to protect the public." Wittke, *supra*, at 938 (citing 42 U.S.C. § 9605(a)(4)).

**28.** In fact, the original version of MERLO—Ordinance 1650—specifically stated that Lodi may recover all costs "not inconsistent with the NCP." The Insurers allege that Lodi specifically amended MERLO so that the revised version of the ordinance—Ordinance 1684—omits any reference to the NCP and instead permits the City to recover all costs "not inconsistent with the requirements of this chapter." According to the Insurers, this amendment "masks rather than eliminates the problem."

change the burden of proof for a recovery of CERCLA response costs in any CERCLA cause of action, but instead incorporates the [NCP] as a guide to recovery of municipal response costs as a matter of municipal law." Lodi further asserts that "[b]ecause [MERLO] speaks to the expenditure and recovery of municipal costs, the City could have, consistent with State and Federal law, keyed recovery of costs to some other plan entirely." Thus, according to Lodi, "[t]he fact that [MERLO] refers to the [NCP] does not tie municipal liability to federal burdens of proof."[29] We agree with Lodi's argument.

The Lodi site is not a listed site under CERCLA and all parties appear to agree that CERCLA has not been triggered in any way. If CERCLA does not govern the cleanup of a particular municipal hazardous waste site, we see no reason why Lodi cannot require cleanup consistent with the NCP and then recover whatever response costs are permitted in accordance with a local law such as MERLO. Under such circumstances, compliance with both MERLO and CERCLA is not impossible because compliance with CERCLA is not required at all. Moreover, under such circumstance, compliance with MERLO does not stand as an obstacle to the achievement of CERCLA's objectives because in the absence of remedial action under CERCLA, whatever level of remediation Lodi is able to provide under MERLO is preferable to no remediation at all.[30]

Second, in addition to alleging that MERLO shifts the presumption for recovering cleanup costs, the Insurers suggest

another reason why the provisions of MERLO addressing the NCP may be preempted by state or federal law. According to the Insurers, MERLO is preempted to the extent that it permits Lodi to order remediation that is either more or less stringent than the NCP. Specifically, under MERLO § 8.24.030(A)(5):

> [T]he enforcing officer may order *additional or more stringent requirements* for abatement action than those that would or might apply under the NCP whenever the enforcing officer determines that there is or may be an endangerment to the public health, welfare, the environment or natural resources arising out of . . . an existing or threatened environmental nuisance, and the enforcing officer determines that such additional or more stringent requirements are necessary . . . to secure adequate protection against . . . such environmental nuisance . . . or are necessary . . . to protect or restore approved land uses consistent with the general plan within the city.

MERLO § 8.24.030(A)(5) (emphasis added). Similarly, MERLO § 8.24.030(A)(6) states that the City "*may order less stringent requirements* for the abatement [of an environmental nuisance] than those that would or might apply under the NCP" if the City "determines that it is in the best interests of the public health, welfare, the environment or natural resources...." MERLO § 8.24.030(A)(6) (emphasis added). Finally, MERLO § 8.24.030(A)(7) states that "at any site within the city which is [a listed site under HSAA], the

---

**29.** We note here that Lodi is not arguing that it is entitled to stand in the shoes of the state and receive the presumption accorded to the state under CERCLA. *See, e.g., Washington State Dep't of Transp.,* 59 F.3d at 799–800 (finding that the Washington State Department of Transportation is the "State" under CERCLA § 9607(a)(4)(A)). Because Lodi

does not advance this argument, we express no opinion on this issue.

**30.** We express no opinion on and have not considered whether any portions of MERLO would be preempted by CERCLA if CERCLA applied to the Lodi site.

enforcing officer must, at a minimum, comply with [HSAA]." MERLO § 8.24.030(A)(7).

Read together, these three sections generally provide the Lodi officer enforcing MERLO with the discretion to order more or less stringent remediation of most hazardous waste sites within the City. In the case of a City waste site that is also a listed site under HSAA, however, the Lodi enforcing officer must, at a minimum, comply with the requirements of HSAA. And HSAA, in turn, requires compliance with the NCP. Cal. H & S Code § 25356.1.5(a).

■ To the extent that MERLO § 8.24.030(A)(5) permits Lodi to order abatement that is more stringent than the NCP, we find that MERLO is not preempted by either state or federal law. "CERCLA sets only a floor, not a ceiling, for environmental protection." *Akzo Coatings*, 949 F.2d at 1454. Accordingly, "state laws which establish 'more stringent' environmental standards are not preempted by CERCLA." *Id.* (quoting 42 U.S.C. § 9621(d)(2)(A)). It therefore stands to reason that a municipal ordinance which similarly provides for more stringent environmental standards is also not preempted.

The Insurers. also argue, however, that the MERLO provision permitting abatement that is "less stringent" than the NCP is preempted by CERCLA and HSAA. We disagree. MERLO was drafted to escape preemption in this regard by requiring compliance with the NCP to the extent that Lodi seeks remediation costs or orders abatement in connection with a hazardous waste site that is governed by CERCLA or HSAA. Because MERLO mandates consistency with the NCP to the extent that MERLO's abatement actions affect the cleanup of CERCLA or HSAA sites, MERLO § 8.24.030(A)(6) is not preempted by either state or federal law.

As discussed *supra*, with respect those City sites that are subject to neither CERCLA nor HSAA, Lodi remains free to determine its own cleanup standards and procedures.

**(3) Information Gathering Authority**

■ The Insurers next argue that MERLO § 8.24.050 conflicts with both CERCLA and HSAA. Section 8.24.050 authorizes Lodi to compel the production of any documents, information, and testimony:

> ... for the purposes of investigating the nature or source of ... an environmental nuisance, or for the purposes of determining the need for abatement actions, choosing or taking an abatement action under this chapter, or for the purposes of determining the nature and extent of the assets and financial resources that are or may be available to (or available to provide indemnity or similar benefits to) any potentially responsible parties to undertake abatement actions which are or may be required pursuant to this chapter or to reimburse the comprehensive municipal environmental response fund for any abatement action costs incurred or to be incurred by the city pursuant to this chapter.

MERLO § 8.24.050(A). The Insurers assert that by this section, Lodi has improperly "arrogated to itself" information-gathering powers that only the EPA can provide under CERCLA § 104(e), and only DTSC can provide under HSAA § 25358.1(a). The Insurers further allege that Lodi thrice requested that the EPA delegate its information-gathering powers to Lodi, and all three times the EPA refused. The Insurers therefore conclude that Lodi adopted MERLO to bestow upon itself information-gathering powers

that it could not lawfully exercise under CERCLA or HSAA. We disagree.

Section 104(e) of CERCLA, 42 U.S.C. § 9604(e) "grants the EPA broad information-gathering authority." *United States v. Martin*, 2000 WL 1029188 at *3 (N.D.Ill. 2000). The statute enables the EPA, or a "duly designate[d]" representative of the EPA or the president, "to gather information and documents from individuals who may have relevant information about the presence of hazardous wastes on a site under investigation." *Id.*; 42 U.S.C. § 9604(e)(1). Similarly, HSAA provides that DTSC, "a representative of the department, or any person designated by the director" may request similar information from a PRP "or any person who has, or may have, acquired information relevant" to the "release or threatened release of a hazardous substance." Cal. H & S Code § 25358.1(a)-(b).

It is true, as the Insurers allege, that MERLO's information-gathering provision permits Lodi to obtain essentially the same information that the EPA may obtain under CERCLA § 104(e) and that DTSC may obtain under HSAA § 25358.1(a). *Compare* MERLO § 8.24.050, *with* 42 U.S.C. § 9604(e) and HSAA § 25358.1(a). It is also true that the EPA denied Lodi's three requests for a delegation of the EPA's information-gathering authority under CERCLA § 104(e). That does not mean, however, that the EPA or DTSC has abrogated Lodi's authority to gather information independent of CERCLA or HSAA. Indeed, neither CERCLA nor HSAA purports to prevent governmental entities, such as municipalities, from gathering information in the absence of a delegation of authority by the EPA or DTSC.

Notwithstanding any authority that Lodi may acquire by delegation,[31] Lodi has independent authority to promulgate information-gathering legislation pursuant to its traditional police powers. These powers include the City's authority to gather the information reasonably necessary to discharge its duty to protect the public health and welfare from public nuisances. *See* Cal. Gov't Code § 38773.5 (a municipality's legislative body may by Ordinance establish a procedure for the abatement of a nuisance). In addition, California Government Code § 37104 specifically authorizes city councils to issue legislative subpoenas. As § 37104 states: "The legislative body may issue subpoenas requiring attendance of witnesses or production of books or other documents for evidence or testimony in any action or proceeding pending before it." Cal. Gov't Code § 37104. Indeed, as noted above, Lodi's authority to issue legislative subpoenas under MERLO and pursuant to California Government Code § 37104 was recently reaffirmed by the California Supreme Court in *Connecticut Indemnity v. Superior Court*, 23 Cal.4th 807, 98 Cal. Rptr.2d 221, 3 P.3d 868 (2000).

Moreover, Lodi's decision to exercise its independent information-gathering authority by enacting MERLO does not conflict with either state or federal law. Compliance with an information-gathering request under MERLO would not make compliance with such a request under CERCLA or HSAA impossible. *See Industrial Truck Ass'n*, 125 F.3d at 1309 (explaining that court will find federal conflict preemption when "it is impossible to comply with both state and federal requirements"). Nor would it "stand as an obstacle to" accomplishing and executing

---

**31.** Lodi does not claim to be exercising authority delegated by either DTSC or the EPA pursuant to HSAA or CERCLA.

the goals of CERCLA and HSAA. *Id.* (stating that courts will find federal conflict preemption when "state law stands as an obstacle to the accomplishment and execution of the full purpose and objectives of Congress"). Finally, permitting Lodi to issue legislative subpoenas does not prohibit conduct expressly authorized by state statute or authorize conduct expressly prohibited by state law. *See Sports Comm. Dist.,* 113 Cal.App.3d at 159, 169 Cal.Rptr. 652.

For these reasons, we find that MERLO's information-gathering provisions are not preempted by either CERCLA or HSAA.

### (4) Recovery of Attorney's Fees and Other "Abatement Action Costs"

Under MERLO § 8.24.040, Lodi may recover from any PRP "[a]ll *abatement action costs* incurred by the city to undertake, or cause or compel any responsible party to undertake, any abatement action in compliance with the requirements of this chapter ..." MERLO § 8.24.040(A)(9)(a) (emphasis added). MERLO defines the phrase "abatement action costs" to include "any and all legal, technical or administrative fees and costs and interest and other costs of financing incurred by the [C]ity in performing or preparing to perform an abatement action." MERLO § 8.24.010(2).[32] Thus,

MERLO permits the City to recover any attorney's fees it incurred in the course of its efforts to cleanup the PCE contamination of its soil and groundwater.

The Insurers assert that these provisions of MERLO are preempted by CERCLA because they permit Lodi to recover attorney's fees when the Supreme Court has already held that the City would be barred from recovering attorney's fees under CERCLA. Contrary to the Insurers' assertion, however, it remains an open question whether a municipality such as Lodi would be entitled to recover attorney's fees under CERCLA.

In *Key Tronic Corp. v. United States,* 511 U.S. 809, 114 S.Ct. 1960, 128 L.Ed.2d 797 (1994), the Supreme Court held that CERCLA § 107(a)(4) does not permit a *"private party"* to recover her attorney's fees. 511 U.S. at 817–19, 114 S.Ct. 1960 (emphasis added). However, in *United States v. Chapman,* 146 F.3d 1166 (9th Cir.1998), we held that CERCLA § 107(a)(4) permits *"the government"* to recover all "reasonable attorney fees" "attributable to the litigation as a part of its response costs" if it is the "prevailing party." *Chapman,* 146 F.3d at 1175–76 (citing *Key Tronic,* 511 U.S. at 813, 819, 114 S.Ct. 1960) (emphasis added). The Insurers assert that a municipality such as Lodi is a "private person" for purposes of CERCLA § 107(a)(4), and that therefore,

---

**32.** According to Fireman's Fund, the amended version of MERLO—Ordinance 1684—expanded the definition of "abatement action costs" to also include "[t]he costs of issuing, servicing, and retiring of any financial instruments authorized by the city council ..." MERLO, § 8.24.010(2)(h)(ii). This provision appears to refer to a loan that the City took out in order to finance its environmental remediation program. As Lodi explained:

> Consistent with its original enforcement decisions and commitments, the City has remained determined to implement the Lodi

Environmental Remediation Program without imposing the burden of Site response costs on the City's innocent taxpayers or ratepayers. Accordingly, the City has sought to borrow from the capital markets additional funds on terms that would not impact the general or special funds of the City of Lodi. To that end, the City of Lodi identified a lender that was willing to provide funds to the City of Lodi for implementation of the Lodi Environmental Remediation Program on terms acceptable to the City Council.

under *Key Tronic*, Lodi is barred from recovering any attorney's fees under CERCLA.[33]

Regardless of whether the City would be barred from recovering such fees *in an action under CERCLA*, in the context of this case, CERCLA does not preempt the City's general municipal authority to recover attorney's fees *in an action under a municipal ordinance such as MERLO*. Although the Insurers argue that CERCLA preempts any state or local law "that allow[s] a party to recover costs that are not recoverable under CERCLA," the cases they cite in support of this assertion are distinguishable.

The Insurers rely exclusively on three out-of-circuit cases. In all three cases, a PRP attempted to invoke state statutory or common law remedies as an end-run around CERCLA's requirements. Under those circumstances, the Second, Third, and Seventh Circuits all held that state and common law principles of indemnification, contribution, and restitution cannot be used to alter CERCLA-imposed liabili-

ty. *See PMC, Inc. v. Sherwin–Williams, Co.*, 151 F.3d 610, 617–18 (7th Cir.1998); *Bedford Affiliates*, 156 F.3d at 426–27; and *In re Reading Co.*, 115 F.3d at 1117.[34]

Unlike the cases cited by the Insurers, in the present action, all parties agree that CERCLA has not been "triggered" in any way. Therefore, unlike the parties in the three cases cited above, Lodi is not seeking to use MERLO to end-run the requirements of CERCLA in a CERCLA action. Instead, by enacting MERLO, Lodi seeks to enhance the City's ability to remediate local hazardous waste contamination *in the absence of a CERCLA action or other federal involvement*. This case is thus distinguishable from *PMC, Bedford Affiliates*, and *In re Reading Co.*

Furthermore, because CERCLA has not been triggered in this case, compliance with both MERLO and CERCLA is not a physical impossibility because compliance with CERCLA is not required at all. *Cf. California Fed. Sav. & Loan Ass'n*, 479 U.S. at 281, 107 S.Ct. 683 (stating that courts will find federal conflict preemption

---

**33.** To date, we have declined to decide whether a municipality is a "private party" or the "State," i.e., the government, for purposes of CERCLA § 107(a)(4). *See Washington State Dep't of Transp.*, 59 F.3d at 800 & n. 5 (holding that state *administrative departments and agencies* are within CERCLA's definition of "State" under § 107(a)(4) and declining to reach the question whether a *municipality* is the "State" under that provision). Thus, it is not clear whether Lodi would indeed be barred from recovering its attorney's fees under CERCLA.

**34.** For example, in *PMC*, the Seventh Circuit held that, the plaintiff PRP did not have a right of contribution under CERCLA for the cleanup costs it incurred because the costs incurred were not consistent with the NCP. *PMC*, 151 F.3d at 616. When the PRP nevertheless sought to recover those costs under an Illinois statute permitting contribution, the Seventh Circuit refused to permit the PRP to use a state contribution law "to nullify" CERCLA's requirement for consistency with

the NCP. *Id.* at 616–18. As the Seventh Circuit explained:

> PMC's invocation of Illinois' contribution statute is an attempt to nullify the sanction that Congress imposed for the kind of CERCLA violation that PMC committed. A savings clause is not intended to allow specific provisions of the statute that contains it to be nullified. CERCLA's savings clause, [which preserves the viability of state law], must not be used to gut CERCLA. The purpose of a savings clause is merely to nix an inference that the statute in which it appears is intended to be the exclusive remedy for harms caused by the violation of the statute.... The passage of federal environmental laws was not intended to wipe out the common law of nuisance.

*PMC*, 151 F.3d at 618. The Seventh Circuit thus held that PMC could not rely on state law to circumvent the requirements of CERCLA in a CERCLA action. *See id.*

when "compliance with both the federal and state regulations is a physical impossibility"). Similarly, the attorney's fee provisions of MERLO do not stand as an obstacle to the achievement of Congress's objectives in enacting CERCLA. *Cf. id.* (stating that courts will also find federal conflict preemption when the state law stands as "an obstacle to the accomplishment and execution of the full purposes and objectives of Congress"). On the contrary, permitting Lodi to recover attorney's fees will aid the City in its effort to expeditiously remediate "a potential environmental catastrophe to its drinking water supply." *Connecticut Indem. Co. v. Superior Court,* 86 Cal.Rptr.2d 515, 526 (1999) (Davis, J., dissenting), rev'd 23 Cal.4th 807, 98 Cal.Rptr.2d 221, 3 P.3d 868 (2000). This effort is wholly consistent with the goals of CERCLA. *See Stanton Road Assoc.,* 984 F.2d at 1019 (stating that

timely remediation of hazardous waste is a key goal of CERCLA). We therefore find that the attorney's fee provisions of MERLO are not preempted by CERCLA.[35]

## (5) Direct Actions Against Insurers

■ The Insurers also argue that MERLO § 8.24.090[36] conflicts with both CERCLA and California Insurance Code § 11580. MERLO § 8.24.090 permits Lodi to initiate direct actions against insurers of PRPs in two situations. First, after Lodi has obtained a "final order or judgment" against the insured PRP in either an administrative or judicial action, MERLO permits the City to file a direct action against the PRP's insurer if the insurer "elects to deny or otherwise contest its liability" under the terms of its contract with the PRP. MERLO § 8.24.090(B)(6).[37] The Insurers do not

---

35. In addition to arguing that MERLO is preempted because Lodi is barred from recovering attorney's fees under CERCLA, the Insurers also assert that MERLO is preempted because it permits Lodi to recover more than simply the limited range of "necessary response costs" that are permitted under CERCLA and HSAA. As the Insurers explain: Ordinance 1684 also extends "Abatement Action Costs" to include (1) Lodi's costs of "investigating and evaluating" the $16 million loan to fund its litigation, as well as (2) its costs in "issuing, servicing, and retiring" the financial instruments necessary to secure the loan, for example the 25 to 30 percent interest. In other words, Lodi intends to pass its usurious boondoggle on to insurers. However, these financing costs are not the "necessary costs of response," 42 U.S.C. § 9607(a)(4)(B), that state and federal law allow Lodi to recover. A party may not recover under CERCLA "for steps taken [that] were extravagant or otherwise unreasonably costly" even if they were consistent with the NCP.

As set forth above, under the circumstances of this case, we find that MERLO's attorney's fee provisions generally do not conflict with CERCLA. To the extent that the Insurers seek a determination of the exact costs that

Lodi may recover, however, we decline to consider that issue at this time. Precisely what costs the City may recover from any one PRP is best determined on a case-by-case basis, in the context of a specific cost recovery request.

36. As discussed *supra,* on November 17, 1999, Lodi's City Council repealed the original MERLO—Ordinance 1650—and reenacted an amended version of MERLO—Ordinance No. 1684—which became effective on December 17, 1999. Because we apply the law in effect at the time of decision, we must decide the issues raised in these related appeals based on the current version of MERLO. *Bradley,* 416 U.S. at 711, 94 S.Ct. 2006. Therefore, unless stated otherwise, all references to MERLO are to the appropriate section of the amended MERLO, Ordinance 1684.

37. Specifically, MERLO § 8.24.090(B)(6) provides in relevant part:

If the indemnitor elects to deny or otherwise contest liability under the terms and conditions of its contract ... with the [PRP] in the administrative action commenced by the enforcing officer or in the civil action commenced by the city attorney pursuant to

allege that this section of MERLO conflicts with either federal or state law.

However, MERLO also permits direct actions against insurers of PRPs in a second situation. Under MERLO § 8.24.090(B)(1), Lodi may also initiate a direct action against a PRP's insurer *before* the City has obtained a final order or judgment against the insured PRP:

> In any case where a[PRP] is in bankruptcy, reorganization, or arrangement pursuant to the Federal Bankruptcy Code, or if with reasonable diligence, jurisdiction cannot be obtained over a[PRP] who is likely, as adjudged at the time of the commencement of the action, to be solvent to meet all of the relief demanded in the city's complaint or administrative order at the time of judgment or at the time an administrative order becomes final and binding, the [C]ity may commence a civil or administrative action to seek relief based upon, or to otherwise recover upon, liability imposed pursuant to this chapter directly against any person that is or may be a surety for, or a guarantor, indemnitor or insurer of ("indemnitor") such a[PRP] on any claim arising under this chapter. In any such action, the indemnitor shall be named as the defendant ... on its relationship to (i.e., "ex rel." or relator) the [PRP] whose liability under this chapter is at issue.

MERLO § 8.24.090(B)(1). The Insurers allege that this portion of MERLO is preempted because it conflicts with CERCLA § 108(c) and California Insurance Code § 11580. Because we find that MERLO § 8.24.090(B)(1) conflicts with California insurance law and is therefore preempted on this basis, we need not consider whether it also conflicts with CERCLA.[38]

California Insurance Code § 11580 states that every liability insurance policy issued in California must include "[a] provision that *whenever judgment is secured against the insured ... in an action based upon bodily injury, death, or property damage, then an action may be brought against the insurer on the policy* and subject to its terms and limitations, by such judgment creditor to recover on the judg-

---

this subsection, the final order or judgment entered in such action brought pursuant to this subsection shall be enforceable directly against the indemnitor(s)....
MERLO § 8.24.090(B)(6).

**38.** CERCLA § 108(c) provides in relevant part:

In the case of a release or threatened release from a facility, any claim authorized by section 9607 or 9611 of this title may be asserted directly against any *guarantor* providing evidence of financial responsibility for such facility under subsection (b) of this section, if the person liable under section 9607 of this title is in bankruptcy, reorganization, or arrangement pursuant to the Federal Bankruptcy Code, or if, with reasonable diligence, jurisdiction in the Federal courts cannot be obtained over a person liable under section 9607 of this title who is likely to be solvent at the time of judgment.
42 U.S.C. § 9608(c)(2) (emphasis added). There are few published federal court deci-

sions addressing whether the above-quoted section of CERCLA permits injured third parties to bring direct actions against insurers of PRPs. *American Policyholders Ins. Co. v. Nyacol Prods., Inc.*, 989 F.2d 1256, 1263 n. 11 (1st Cir.1993); *see also generally* Peter R. Mounsey, *The Direct Action Against Insurers in CERCLA Insolvency Cases: An Idea Whose Time Has Come?*, 18 Wm. & Mary J. Envtl. L. 83 (1993) (arguing the CERCLA § 108(c) is broad enough to permit direct actions against insurers of PRPs). There are also few published federal court decisions addressing whether this provision of CERCLA preempts broader state or municipal direct action statutes. *City of New Orleans v. Kernan*, 933 F.Supp. 565, 567–68 (E.D.La.1996) (finding that CERCLA preempts Louisiana's direct action statute); *see also Port Allen Marine Servs., Inc. v. Chotin*, 765 F.Supp. 887, 889 (E.D.La. 1991) (same).

ment." Cal. Ins.Code § 11580(b)(2) (West 2001) (emphasis added). Fireman's Fund asserts that this statute "forbids direct actions against an insurer absent a final judgment against the insured." Fireman's Fund further asserts that because MER-LO § 8.24.090(B)(1) *authorizes* direct actions against the insurers of PRPs prior to obtaining a final judgment against the insured, but § 11580 *forbids* such actions, MERLO § 8.24.090(B)(1) conflicts with and is therefore preempted by California law. *Sports Comm. Dist.*, 113 Cal.App.3d at 159, 169 Cal.Rptr. 652 (stating that conflict preemption under California law includes situations in which a local statute authorizes conduct prohibited by state law).

We begin our conflict preemption analysis with the plain language of the statute. *See Moyer v. Workmen's Compl. Appeals Bd.*, 10 Cal.3d 222, 230, 110 Cal.Rptr. 144, 514 P.2d 1224 (1973). Contrary to Fireman's Fund's contention, on its face, § 11580 neither prohibits direct actions nor purports to set forth the only circumstances under which one can initiate a direct action against an insurer. It simply *allows* direct actions after the third-party claimant has obtained a final judgment against the insured.

Nevertheless, California's lower courts are divided on the proper interpretation of § 11580. Two California Court of Appeals cases support the conclusion that § 11580 does *not* set forth the exclusive set of circumstances under which one can initiate a direct action against an insurer. *See Roberts v. Home Ins. Indem. Co.*, 48 Cal. App.3d 313, 317–18, 121 Cal.Rptr. 862 (1975) ("[S]ection 11580 ... is silent as to a direct action against the insurer before judgment is obtained against the insured. That silence does not imply a legislative policy against allowing a claimant to pursue any rights which may have been creat-

ed by contract or by another state's direction action statute."); *Turner v. Evers*, 107 Cal.Rptr. 390, 31 Cal.App.3d Supp. 11, 22 (Cal.App. Dep't Super. Ct.1973) ("[S]ection 11580, subdivision (b), is a statement of the minimum provisions that must be included in all liability insurance policies issued in this state.").

However, there is equal, and perhaps greater authority to suggest that § 11580 sets forth the exclusive set of circumstances under which a third-party claimant may directly sue another policyholder's liability insurer. *See McKee v. National Union Fire Ins. Co.*, 15 Cal.App.4th 282, 286–87, 19 Cal.Rptr.2d 286 (1993); *Nationwide Ins. Co. v. Superior Court*, 128 Cal.App.3d 711, 180 Cal.Rptr. 464, 466 (1982) (noting "the general rule of indemnity law that '[w]here the terms of the indemnity contract, or law of the state, require a judgment against the ... [indemnitee] before direct action against the insurer, no liability accrues as an enforceable claim against the insurer until recovery of a final judgment against [the indemnitee].'"); *Zahn v. Canadian Indem. Co.*, 57 Cal.App.3d 509, 129 Cal.Rptr. 286, 288 (1976) ("It is fundamental that generally speaking the injured party may not directly sue an insurer of the alleged tortfeasor."); *see also Tashire v. State Farm Fire & Cas. Co.*, 363 F.2d 7, 10 (9th Cir.1966), *rev'd on other grounds*, 386 U.S. 523, 87 S.Ct. 1199, 18 L.Ed.2d 270 (1967) (stating that "under the law of California ... a direct action against the insurer is not allowable until after the claimant shall have secured a final judgment against the insured"); *Laguna Publ'g Co. v. Employers Reinsurance Corp.*, 617 F.Supp. 271, 272 (C.D.Cal.1985) (quoting *Tashire*).

In light of the dearth of California case law addressing this precise issue and in the absence of guidance from the California Supreme Court, we defer to the majority of California lower courts and hold that

MERLO § 8.24.090(B)(1) is preempted by California Insurance Code § 11580 to the extent that it expands the ability of Lodi to bring direct actions against a PRP's insurer beyond what is permitted by California insurance law.

### (6) MERLO's Liability Scheme

■ The Insurers next allege that the provisions of MERLO providing for joint and several liability, with a right of contribution, conflict with and are therefore preempted by CERCLA and HSAA. We agree in part with the Insurers' assertions.

■ CERCLA § 107 permits the government or a private party who has incurred response costs to bring suit against a PRP to recover those costs. 42 U.S.C. § 9607. Applying federal common law principles, we have interpreted CERCLA § 107 as imposing joint and several liability on PRPs whenever the harm caused to a site is indivisible. *Atchison Topeka & Santa Fe Ry. Co.*, 159 F.3d at 362. Importantly, because liability is joint and several, a defendant PRP in a cost-recovery action under CERCLA § 107 may be held fully liable for the entire clean-up costs at a site, despite the fact that the defendant PRP was in fact responsible for only a fraction of the contamination.

Moreover, as originally enacted, CERCLA did not provide PRPs with an express cause of action for contribution. *See Centerior Serv. Co. v. Acme Scrap Iron & Metal Corp.*, 153 F.3d 344, 348 (6th Cir. 1998). Without a claim for contribution, any individual PRP could be singled out as a defendant in a CERCLA § 107 cost-recovery action, and required to reimburse the § 107 plaintiff for response costs far in excess of the defendant PRP's pro rata share. Because such a result appeared inequitable, many courts recognized an implicit right to contribution under CERCLA § 107, where a PRP was subject to joint and several liability and incurred response costs in excess of its fair share. *See, e.g., Mardan Corp. v. C.G.C. Music Ltd.*, 804 F.2d 1454, 1457 & n. 3 (9th Cir.1986).

In 1986, Congress amended CERCLA by passing the Superfund Amendments and Reauthorization Act of 1986 ("SARA"), 42 U.S.C. §§ 9601–9675. Among other additions, SARA added CERCLA § 113(f), which explicitly recognizes a claim for contribution. *Pinal Creek Group v. Newmont Mining Corp.*, 118 F.3d 1298, 1300 (9th Cir.1997). "A PRP's contribution liability [under CERCLA § 113(f) ] correspond[s] to that party's equitable share of the total liability...." *Id.* at 1301. Thus, CERCLA § 107 and CERCLA § 113 provide different remedies: a defendant in a § 107 cost-recovery action may be *jointly and severally liable* for the total response cost incurred to cleanup a site, whereas a defendant in a § 113(f) contribution action is *only liable for his or her pro rata share* of the total response costs incurred to cleanup a site.

Since the adoption of CERCLA § 113(f), "[t]here [has been] some tension among the different circuits as to the interaction between sections 107 and 113." *United States v. Hunter*, 70 F.Supp.2d 1100, 1103 n. 4 (C.D.Cal.1999). For example, courts are split on the question of who may bring a CERCLA § 107 cost-recovery action, and more specifically, whether *a PRP* is entitled to bring a CERCLA § 107 cost-recovery action. We have held that a *private* PRP who incurs response costs may not bring a cost-recovery action under CERCLA § 107, and instead may only bring a claim for contribution under CERCLA § 113(f). *Pinal Creek*, 118 F.3d at 1301. We have not yet considered, however, whether a *government* PRP such as a municipality that similarly incurs response costs may bring a cost-recovery action under CERCLA § 107. *Compare*

*Hunter,* 70 F.Supp.2d at 1108 (holding that the government PRP may bring a cost-recovery action pursuant to CERCLA § 107, thereby imposing joint and several liability on the defendant PRP), *with City of Fresno,* 1995 WL 641983, at **2–5 (holding that because the City of Fresno was a PRP, it was limited to a claim for contribution under CERCLA § 113(f)).

HSAA is like CERCLA in that HSAA explicitly authorizes any PRP that has incurred response costs to seek contribution from any other PRP. Cal. H & S Code § 25363(e). However, "unlike liability under CERCLA, liability under HSAA is not truly joint and several. Any person found liable for costs under [ ] HSAA who establishes by a preponderance of the evidence that only a portion of those costs or expenditures are attributable to that person's actions will be required to pay only for that portion." Bancroft–Whitney, *supra,* § 3:85; *see also* Cal. H & S Code § 25363(a). Liability under HSAA is therefore apportioned according to fault.

The Insurers allege that MERLO's liability scheme is preempted by CERCLA and HSAA for two distinct reasons. First, the Insurers allege that MERLO conflicts with CERCLA because under MERLO § 8.24.040, Lodi may impose joint and several liability for the entire clean-up costs on any one PRP, whereas CERCLA does not permit "a PRP such as Lodi to impose joint and several liability on other PRPs." Even assuming arguendo that Lodi is a PRP, this argument lacks merit.

First, our circuit has not yet decided whether a government PRP may bring a CERCLA § 107 cost-recovery action against another PRP. Thus, it is not clear whether there is in fact an inconsistency between Lodi's rights under MERLO and its rights under CERCLA. Second, CERCLA does not apply to the Lodi site. Where the federal or state agency autho-

rized to assert jurisdiction under CERCLA or HSAA is not actively responding to hazardous waste sites, local governments are empowered, and indeed encouraged, to facilitate the remediation of such sites by enacting local ordinances that are consistent with the overall objectives of state and federal law. MERLO meets these requirements. The fact that MERLO is not identical to CERCLA does not necessarily mean that MERLO conflicts with CERCLA. As the district court explained:

[MERLO] is not in actual conflict with CERCLA.... Placed side by side, the Ordinance and CERCLA differ but it is not physically impossible for Fireman's Fund to comply with the provisions of CERCLA and the provisions of the Ordinance. Moreover, no agency, federal or state, is enforcing CERCLA's provisions in this hazardous waste cleanup effort, nor has Fireman's Fund identified any provision of CERCLA with which it must comply pursuant to any order or request of any federal or state agency. Therefore, Fireman's Fund need not choose between compliance with CERCLA and compliance with the Ordinance. Nor does the Ordinance stand as an obstacle to the prompt and efficient remediation of hazardous waste sites. To the contrary, the Ordinance seeks to efficiently collect funds with which the City can institute hazardous waste cleanup. The Ordinance differs from CERCLA in several respects but it is consistent with the overall objectives of CERCLA.

*Fireman's Fund,* 41 F.Supp.2d at 1111–12. Thus, we find that MERLO's joint and several liability provisions do not conflict with CERCLA.

The Insurers' second preemption argument regarding MERLO's liability scheme cannot be so easily resolved, however. Here, the Insurers argue that MERLO

conflicts with CERCLA and HSAA because "CERCLA and HSAA allow any PRP that has incurred response costs to seek contribution from any other PRP," while under MERLO, Lodi cannot be sued for contribution.

This conflict preemption argument is rooted in the Insurers' assumption that Lodi is a PRP. To date, however, Lodi has not been administratively adjudged a PRP by either the federal EPA or California's DTSC. Nor has a court adjudged Lodi a PRP. Indeed, as discussed above, it is not clear as a matter of law whether a municipality such as Lodi may be considered a PRP solely as a result of operating a municipal sewer system. *Compare Lincoln Prop.*, 823 F.Supp. at 1539–44 (E.D.Cal. 1992) (holding that a municipal sewer system that leaked hazardous waste could rely on a third-party defense to avoid liability under CERCLA), *with Westfarm Assoc.*, 66 F.3d at 675–80 (holding that a municipal sewer system is liable for the acts of a third party that discharged hazardous waste into the system).

Nonetheless, if we assume arguendo that Lodi is a PRP, we must find that MERLO is preempted to the extent that it protects Lodi from contribution claims by other PRPs. Although CERCLA has not yet been triggered, CERCLA permits a PRP who incurs response costs to bring suit to recover those costs from any other PRP.[39] Thus, in theory, Fireman's Fund's or Unigard's insured could decide to remediate the Lodi site, and then sue the City pursuant to CERCLA § 113(f) for contribution.[40] If Lodi is indeed a PRP, it cannot simply legislate away this potential contribution liability under state and federal law. For these reasons, we find that MERLO is preempted to the extent that it legislatively insulates Lodi from contribution liability under state and federal law.[41]

### (7) MERLO's Burden of Proof for PRPs for Establishing a Defense to Liability

The final conflict preemption claim that we must consider involves the burden of proof that a defendant PRP must satisfy under MERLO in order to equitably apportion its liability for remediation costs. The Insurers assert that MERLO conflicts with CERCLA and HSAA because MERLO requires a defendant PRP seeking to apportion its liability to demonstrate by clear and convincing evidence that the harm is divisible, see MERLO § 8.24.040(E),[42] whereas CERCLA, 42 U.S.C. § 9607(b), and HSAA, Cal. H & S Code § 25363(a), only require a

---

**39.** "Listing is not a prerequisite to liability under 42 U.S.C. § 9607(a)." Bancroft–Whitney, *supra*, § 3:10.

**40.** We note that there may be circumstances in which "a particular PRP's equitable share of the total liability should be zero." *Pinal Creek Group*, 118 F.3d at 1301 n. 1.

**41.** In so holding, however, we do not consider whether Lodi may be entitled to contribution protection as a result of the Cooperative Agreement between Lodi and California's DTSC.

**42.** Specifically, under MERLO § 8.24.040(E):

Any responsible party seeking to apportion the harm must demonstrate by *clear and convincing evidence* that the component of the harm which is sought to be apportioned is scientifically and technologically susceptible to apportionment, that there is a reasonable and practicable basis for apportioning the harm, and that the separate abatement activity proposed for that harm is as practicable, safe, efficient, reliable and cost-effective in providing the degree of protection of the public health, welfare and the environment as the abatement activity or activities, if any, proposed by the enforcing officer.

MERLO § 8.24.040(E) (emphasis added).

PRP to demonstrate that the harm is divisible by a preponderance of the evidence.

We need not decide whether Lodi may create a higher burden of proof for contribution than under CERCLA because MERLO is clearly preempted by HSAA. California's DTSC listed the Lodi Groundwater Site beginning in fiscal year 1993–94. The Lodi Groundwater Site is therefore subject to the "procedures, standards, and other requirements" of HSAA. Cal. H & S Code § 25356(d). Because HSAA governs the Lodi site, and the burden of proof for apportioning harm under MERLO is inconsistent with the burden of proof for apportioning harm under HSAA, we find that MERLO's burden of proof is preempted by HSAA.

### d. Duplication

▆▆▆▆ The only remaining preemption issue is whether MERLO is preempted by HSAA because "the local regulation duplicates state law." *Cohen v. City of San Francisco,* 40 Cal.3d 277, 219 Cal. Rptr. 467, 475, 707 P.2d 840 (1985). "Duplication will be found if the substantive reach of the ordinance is 'co-extensive' with state law." *Eller Media Co. v. City of Oakland,* 1998 WL 827426, at *4 (N.D.Cal. 1998) (quoting *Suter v. City of Lafayette,* 57 Cal.App.4th 1109, 67 Cal.Rptr.2d 420 (1997)). The duplication doctrine is rooted in a concern regarding "the inevitable conflict of jurisdiction which would result from dual regulations covering the same ground." *Id.* There is no federal analogue to California's doctrine of preemption by duplication.

The Insurers assert that MERLO is preempted to the extent that it duplicates HSAA. We disagree. First, California courts have "largely confined" the duplication prong of the state preemption test to penal ordinances. *Baldwin v. County of Tehama,* 31 Cal.App.4th 166, 36 Cal. Rptr.2d 886, 894 (1995). Second, to the extent that the duplication doctrine may apply to non-penal cases, the fact that California entered into the Cooperative Agreement with Lodi militates against finding preemption by duplication in this case. Indeed, the Cooperative Agreement expressly states that it was designed to "avoid[ ] duplication of efforts" to cleanup the hazardous waste contamination in the City.

Moreover, the Agreement between DTSC and Lodi belies any concern regarding "the inevitable conflict of jurisdiction which would result from dual regulations covering the same ground." *Eller Media,* 1998 WL 827426, at *4. Under HSAA, once DTSC enters into a cooperative agreement such as the Agreement with Lodi, DTSC may not "initiate removal or remedial action pursuant to [HSAA]" unless the actions to be taken under the cooperative agreement are not "being taken properly and in a timely fashion." Cal. H & S Code § 25355(b). In addition, the Cooperative Agreement states that Lodi is the "lead enforcement entity" with respect to the remediation of the Lodi Groundwater Site, and that "DTSC shall not independently prosecute any claims without the full cooperation of and coordination with the City of Lodi." Thus, both the Cooperative Agreement and MERLO were crafted to insure that DTSC and Lodi would not duplicate each others' efforts, but instead would work jointly to remediate the PCE contamination in and around the City.

For these reasons, we find that MERLO is not preempted by the doctrine of duplication.

### e. Summary of Preemption Analysis

In sum, we hold that CERCLA and HSAA do not preempt the field of hazardous waste remediation, either explicitly or by implication. CERCLA permits both states and their political subdivisions to enact hazardous waste regulations and

"pursue additional remedies at [their] own expense, as long as those remedies do not conflict or interfere with," *Akzo Coatings,* 949 F.2d at 1454, "the accomplishment and execution of [CERCLA's] full purpose and objective." *Industrial Truck Ass'n,* 125 F.3d at 1309. We also hold that MERLO is not preempted by the state law doctrine of preemption by duplication.

We conclude, however, that a few limited sections of MERLO are preempted by state and federal law under the doctrine of conflict preemption. In so holding, we note that MERLO expressly provides for severability in the event that any provision of MERLO is held invalid. Under MERLO § 8.24.090(A):

> If any provision of this chapter or the application thereof to any person or circumstances is held invalid, such invalidity shall not affect other provisions of applications of the chapter which can be given effect without the invalid provision or application. To this end, the provisions of this chapter are severable. The city council declares that it would have adopted the ordinance codified in this chapter irrespective of the invalidity of any particular portion thereof.

MERLO § 8.24.090(A). Because we find that the "invalid provisions are easily severable from the remainder of the ordinance," we find that the balance of MER-

LO remains viable and is not preempted in any way by either state or federal law. *Cohen,* 219 Cal.Rptr. at 476, 707 P.2d 840.

## C.  OFFICIAL CAPACITY CLAIM

■  In addition to appealing the district court's decision on the various preemption issues raised in this case, Fireman's Fund also appeals the district court's decision dismissing its claims against three individual defendants in their "official capacities": Lodi City Attorney Randall A. Hays, Enforcement Officer Richard C. Prima. Jr., and Enforcement Officer Fran E. Forkas.[43]

■  The district court dismissed these official capacity claims as duplicative of Fireman's Funds' claims against Lodi. Fireman's Fund asserts that the district court erred in so doing because the above-named municipal officers "are classic *Ex [P]arte Young* defendants" and the official capacity claims are necessary to "effectively foreclose any assertion by Lodi of Eleventh Amendment Immunity."[44] We agree with Fireman's Fund and reinstate the official capacity claims against Hays, Prima, and Forkas.[45]

## V.

## CONCLUSION

In sum, we hold that the district court erred in abstaining from reaching Fire-

---

43.  Fireman's Fund does not appeal the district court's dismissal of Fireman's Fund's official capacity claims against Michael C. Donovan and the Law Firm of Zevnik, Horton, Guibord & McGovern, L.L.P.

44.  "The Eleventh Amendment bars suits which seek either damages or injunctive relief against a state, an 'arm of the state,' its instrumentalities, or its agencies." *Franceschi v. Schwartz,* 57 F.3d 828, 831 (9th Cir.1995). However, under *Ex Parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908), "the Eleventh Amendment does not bar actions seeking only prospective declaratory or injunctive relief against state officers in their

official capacities." *Los Angeles County Bar Assoc. v. Eu,* 979 F.2d 697, 704 (9th Cir. 1992).

45.  Lodi asserts that the official capacity claims against these three municipal officers were also dismissed by the district court on qualified immunity grounds. That is not the case, however. On the contrary, the district court dismissed the *official capacity claims* as duplicative of the claims against the City, and dismissed the "remaining *individual capacity claims*" on qualified immunity grounds. *Fireman's Fund,* 41 F.Supp.2d at 1106 (emphasis added).

man's Fund's state law preemption claim. On the merits of the Insurers' state and federal preemption claims, we hold that CERCLA and HSAA do not preempt the field of hazardous waste remediation, either explicitly or by implication. We further hold that MERLO is not preempted by the state law doctrine of preemption by duplication.

We conclude, however, that a few limited sections of MERLO are preempted by state and federal law under the doctrine of conflict preemption. With the exception of these few provisions, we conclude that the balance of MERLO remains viable and is not preempted in any way by either state or federal law. Finally, we reinstate Fireman's Fund's official capacity claims against Hays, Prima, and Forkas.

For the foregoing reasons, we AFFIRM IN PART, REVERSE IN PART, and REMAND for further proceedings consistent with this opinion.